IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JEROME FERRIER,
      Petitioner,

vs.                          Case No.:  4:17cv178/RH/EMT

FLA. DEP'T OF CORR.,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Jerome Ferrier ("Ferrier") commenced this case by filing a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Presently before the court is Ferrier's Third Amended Petition and supporting memorandum (ECF Nos. 52, 53).  Respondent ("the State") filed an answer and relevant portions of the state court record (ECF No. 74).  Ferrier filed a reply (ECF No. 78).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Ferrier is not entitled to relief.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 74).[1]  Ferrier was charged in the Circuit Court in and for Leon County, Florida, Case No. 2010-CF-1707, with eight counts of attempted first degree murder (Counts I–VIII) and two counts of attempted second degree murder (Counts IX and X) (Ex. B1 at 12–14).  On September 8, 2011, a jury found Ferrier guilty as charged on all counts (Ex. B1 at 79–98, Exs. B2, B3, B4, B5, B6).  The jury also found that (1) the victim of each count was a law enforcement officer, and (2) Ferrier actually possessed a firearm during commission of Counts V and VIII, and he actually possessed and discharged a firearm during commission of the remaining Counts (Ex. B1 at 65–78).  On September 13, 2011, the court set aside the verdicts on Counts V and VIII, pursuant to the State's concession on Petitioner's motion for arrest of judgment (*id.* at 128–29).  The court adjudicated Ferrier guilty

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with the State's answer (ECF No. 74).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

of the remaining Counts and sentenced him to concurrent terms of life in prison (*id.* at 107–16, 126–37).

Ferrier, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-5066 (Ex. B11).  On March 18, 2013, the First DCA issued the following opinion:

> Jerome Ferrier appeals his convictions and sentences for six counts of attempted first degree murder and two counts of attempted second degree murder.  With respect to counts IX and X, counts alleging attempted second degree murder, at trial, the trial court gave the standard jury instruction for the lesser included offense of attempted voluntary manslaughter.  That instruction provided that one of the elements of attempted voluntary manslaughter is that Ferrier committed an act which was intended to cause the death of the victim.

> Recently, the Florida Supreme Court expressly approved our decision in *Lamb v. State*, 18 So. 3d 734, 735 (Fla. 1st DCA 2009), and held that "giving the standard jury instruction on attempted manslaughter by act . . . constitutes fundamental error where the defendant is convicted of an offense not more than one step removed from attempted manslaughter." *Williams v. State*, 123 So. 3d 23 (Fla. 2013); *see also State v. Montgomery*, 39 So. 3d 252 (Fla. 2010).  Accordingly, we hold that the trial court committed fundamental error by giving the jury the standard instruction for the lesser included offense of voluntary manslaughter on the attempted second degree murder charges found in counts IX and X.  Thus, we reverse the convictions under counts IX and X and remand for a new trial on those counts.  We affirm all other issues raised on appeal.

> AFFIRMED, in part, REVERSED, in part, and remanded for further proceedings.

(Ex. B14).  *Ferrier v. State*, 111 So. 3d 920 (Fla. 1st DCA 2013).  The mandate issued May 22, 2013 (Ex. B18).  On July 11, 2013, the State filed a nolle prosequi on Counts IX and X (Ex. B19).

On February 24, 2014, Ferrier filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-0876, alleging ineffective assistance of appellate counsel (Ex. C1).  The First DCA denied the petition on the merits on March 26, 2014 (Ex. 5).  *Ferrier v. State*, 135 So. 3d 504 (Fla. 1st DCA 2014) (Mem).

Meanwhile, on January 27, 2014, Ferrier filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. D1 at 1–65).  On March 26, 2014, the state circuit court dismissed the motion without prejudice (*id.* at 183–86).  On June 17, 2014 Ferrier filed another Rule 3.850 motion (Ex. D2 at 196–242).  Ferrier filed an amended Rule 3.850 motion on September 11, 2014, asserting fifteen grounds for relief (Ex. D3 at 384–451).  On November 17, 2014, Ferrier filed a motion to strike Grounds I–IV, VIII, IX, and parts 1 and 2 of Ground VI (*id.* at 454–55).  On June 9, 2015, the circuit court issued an order striking Grounds I–IV, VIII, IX, and parts 1 and 2 of Ground VI (as Ferrier requested) (*id.* at 482–84).  The court appointed counsel for Ferrier and set a case management conference on the remaining claims (*id.* at 482–84, 486).  An evidentiary hearing was held on August 26, 2015 (Ex. D4).  On October 6, 2015,

the circuit court denied Ferrier's Rule 3.850 (*id.* at 518–26).  Ferrier appealed the

decision to the First DCA, Case No. 1D15-4780 (Ex. D6).  The First DCA affirmed

per curiam without written opinion on January 3, 2017 (Ex. D9).  *Ferrier v. State*,

229 So. 3d 323 (Fla. 1st DCA 2017) (Table).  The mandate issued March 22, 2017

(Ex. D12).  Ferrier filed a notice to invoke the discretionary jurisdiction of the

Supreme Court of Florida, Case No. SC17-584 (Ex. D13).  On April 4, 2017, the

state supreme court dismissed the petition for lack of jurisdiction (Ex. D14).  *Ferrier*

*v. State*, No. SC17-584, 2017 WL 1228723, at *1 (Fla. Apr. 4, 2017).

Ferrier filed the instant federal habeas action on April 28, 2017 (ECF No. 8).

Thereafter, Ferrier continued his post-conviction proceedings in state court.

On June 6, 2017, Ferrier filed a second Rule 3.850 motion in the state circuit court

(Ex. E1 at 32–55).  On June 28, 2017, the circuit court summarily denied the second

Rule 3.850 motion on the ground that two of his claims were untimely, and his third

claim was not cognizable (*id.* at 81–83).  Ferrier appealed the decision to the First

DCA, Case No. 1D17-3476 (Exs. E2, E5).  The First DCA affirmed the lower court's

decision per curiam without written opinion on June 7, 2018 (Ex. E6).  *Ferrier v.*

*State*, 248 So. 3d 1107 (Fla. 1st DCA 2018) (Table).  The mandate issued August 8,

2018 (Ex. E9).

Additionally, on June 21, 2017, Petitioner filed a second habeas petition in the

First DCA, Case No. 1D17-2566 (Ex. G1).   On August 1, 2017, the First DCA

dismissed the petition as untimely (G3).   *Ferrier v. State*, 225 So. 3d 916 (Fla. 1st

DCA 2017) (Mem).   Ferrier filed a notice to invoke the discretionary jurisdiction of

the Supreme Court of Florida, Case No. SC17-1888 (Ex. G8).   On October 25, 2017,

the state supreme court dismissed the petition for review for lack of jurisdiction (Ex.

G9).   *Ferrier v. State*, No. SC17-1888, 2017 WL 4801571, at *1 (Fla. Oct. 25, 2017).

On February 21, 2018, this court granted Ferrier's unopposed motion to stay

this federal habeas proceeding to permit Ferrier an opportunity to exhaust state court

remedies with respect to all of the claims presented in his § 2254 petition (ECF No.

44).

During the stay, Ferrier returned to state court and filed a motion to correct

illegal sentence in the circuit court, pursuant to Rule 3.800 of the Florida Rules of

Criminal Procedure (Ex. F1 at 3–17).   The state circuit court summarily denied the

motion on August 9, 2018, holding that Ferrier's sentencing claims were without

merit, and his claims of ineffective assistance of counsel were untimely and

successive (*id.* at 20–21).   Ferrier appealed the decision to the First DCA, Case No.

1D18-3882 (*id.* at 48–49).   The First DCA affirmed the lower court's decision per

curiam without written opinion on February 27, 2019 (Ex. F3).   *Ferrier v. State*, 265

So. 3d 578 (Fla. 1st DCA 2019) (Table).  The mandate issued March 27, 2019 (Ex.

F4).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal law,
> > as determined by the Supreme Court of the United States; or
> >
> > **(2)**    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached by
> this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct

governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, 575 U.S. 312, 316, 135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See Woods*, 575 U.S. at 317 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct.

2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme

Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning
> their decisions only when there could be no reasonable dispute that they
> were wrong.  Federal habeas review thus exists as "a guard against
> extreme malfunctions in the state criminal justice systems, not a
> substitute for ordinary error correction through appeal."  *Harrington*,
> *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on

the merits in state court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."    28 U.S.C. § 2254(d)(2).    The "unreasonable

determination of the facts" standard is implicated only to the extent the validity of

the state court's ultimate conclusion is premised on unreasonable fact finding.  *See*

*Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable

application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*,

537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state

court decision based on a factual determination "will not be overturned on factual

grounds unless objectively unreasonable in light of the evidence presented in the

state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner makes a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In *Anderson*, the Sixth Circuit Court of Appeals granted the habeas petition on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7. On review by the Supreme Court, the Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the **cited** case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364 (1995).  The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[2]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  *Duncan*, 513 U.S. at 365–66.

In *Baldwin v. Reese*, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The *Baldwin* court commented that "[a] litigant wishing to raise a federal issue can easily indicate the

---

[2] The petitioner in *Duncan* raised a federal due process claim in his habeas petition but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

federal law basis for his claim in a state-court petition or brief, for example, by citing

in conjunction with the claim the federal source of law on which he relies or a case

deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"

*Id.*, 541 U.S. at 32.  With regard to this language, the Eleventh Circuit explained in

*McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . .  We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[3]

---

[3] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.*

A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The federal court "lacks jurisdiction to entertain a federal claim on review of a state court judgment, if that judgment rests on a state law ground that is both independent of the merits of the federal claim and an adequate basis for the court's decision." *Foster v. Chatman*, — U.S. —, 136 S. Ct. 1737, 1745, 195 L. Ed. 2d 1 (2016) (internal quotation marks and citation omitted). Even where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim. *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Harris*, 489 U.S. at 264 n.10).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim. Second, the state court's decision on

the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *Id.* Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of
> an innocent person is extremely rare.  To be credible, such a claim
> requires [a] petitioner to support his allegations of constitutional error
> with new reliable evidence—whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical
> evidence—that was not presented at trial.

*Id.*  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See McQuiggin v. Perkins*, 569 U.S. 383, 399, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013).  As the Court stated in *Schlup*, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Ferrier's claims.[4]

## IV.    FERRIER'S CLAIMS

**A.    Claim I:  "The trial court prevented Petitioner's counsel from arguing his theory of the case in violations [sic] of U.S. Const. Amend VI right to have assistance of counsel for his defense and due process U.S. Const. Amends. V, XIV."**

---

[4] For organizational reasons, the court is consolidating its discussion of some of Ferrier's claims.

Ferrier contends the trial court prevented defense counsel from arguing his theory of the case, i.e., that when Petitioner shot at the victim law enforcement officers, they were illegally attempting to enter his apartment, in violation of the Fourth Amendment, because the officers did not have a search warrant or Ferrier's consent, and there were no exigent circumstances justifying the officers' attempt to enter the residence (ECF No. 52 at 5; ECF No. 53 at 2–3).[5]  Ferrier contends the trial court's ruling violated his equal protection rights under the Fourteenth Amendment (ECF No. 53 at 2).  He asserts he presented this claim to the state courts on direct appeal (ECF No. 52 at 6).

The State contends Ferrier did not exhaust his federal claim in the state courts (ECF No. 74 at 14–20).  The State argues Ferrier presented a similar claim to the trial court when defense counsel advised the court he intended to argue in closing that the jury could presume Ferrier was in reasonable fear of imminent death or great bodily harm, thus justifying his use of deadly force, because the law enforcement officers attempted to enter his residence without his consent, a search warrant, or exigent circumstances (*id.*).  The State contends that although defense counsel

---

[5] References to the party's pleadings are to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of the original documents.

referenced "a core due process right" in his argument to the trial court, this was insufficient to alert the trial court that he was asserting a federal constitutional claim (*id.*). The State argues the same can be said for Ferrier's argument on direct appeal, i.e., he did not fairly present the alleged trial court error as a federal claim (*id.*). The State contends Ferrier's failure to present the federal nature of his claim to the state courts constitutes a procedural default and renders Claim I procedurally barred from federal review (*id.*).

The State alternatively argues that the claim Ferrier presented in the state courts was adjudicated on the merits, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (ECF No. 74 at 62–67). Therefore, Ferrier is not entitled to federal habeas relief (*id.*).

In Ferrier's reply, he contends the claim is exhausted (Ex. 78 at 4–6).

The state court record demonstrates that the issue of the trial court's restricting defense counsel's closing argument (i.e., precluding counsel from arguing the lawfulness of the officers' entry into Ferrier's residence) arose during the charge conference (*see* Ex. B6 at 379–88). Defense counsel argued that the restriction "will take away from my client his self-defense argument, which is a core due process

right that he has in this case" and would "deprive my client of a due process right to present a defense" (Ex. B6 at 383, 385).

Additionally, defense counsel presented the issue in his motion for new trial, in which counsel argued:

> The trial court's ruling prevented defense counsel from arguing his theory of the case and violated the defendant's right to effective assistance of counsel and the defendant's right to present a defense. The right to effective assistance of counsel and the right to present a defense are substantial rights, the denial of which resulted in prejudice to the defendant.

(Ex. B1 at 101–03).

On direct appeal, Ferrier's counsel argued as Issue III that the trial court's ruling, precluding defense counsel from arguing to the jury that law enforcement's attempted entry into Ferrier's residence was unlawful, "prevented defense counsel from arguing his theory of the case and violated [Ferrier's] right to present a defense and his right to effective assistance of counsel" (Ex. B11 at 21, 24). The First DCA did not find error with respect to this issue (*see* Ex. B14).

The undersigned concludes that defense counsel's arguments to the trial court and appellate counsel's argument to the First DCA were sufficient to alert the state courts to the federal nature of Ferrier's claim. The court will thus proceed to consider whether Ferrier has satisfied § 2254(d).

1.    Clearly Established Federal Law

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (internal quotation marks and citations omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). However, the right to present a "complete" defense is not unlimited. *See Chambers*, 410 U.S. at 295 (the right to present a defense is not unlimited and must bow to "other legitimate interests in the criminal trial process").

Additionally, the Sixth Amendment secures the right of a criminal defendant to have his counsel present closing argument. *See Herring v. New York*, 422 U.S. 853, 864–65, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) ("[A] **total** denial of the opportunity for final argument is a denial of the basic right of the accused to make his defense." (emphasis added)). This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. *Id.*, 422 U.S. at 862. The presiding judge "must be and is given great latitude in controlling the duration and

limiting the scope of closing summations." *Id.* The judge may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. *Id.* And the trial judge may ensure that argument "does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.*

## 2. Federal Review of State Court Decision

The First DCA did not provide reasons for affirming the trial court's decision to restrict defense counsel's closing argument (*see* Ex. B14). Therefore, this federal court must "look through" the First DCA's unexplained decision to the rationale provided by the trial court and presume that the First DCA adopted the same reasoning. *See Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018).

The issue first arose during defense counsel's argument on his motion for judgment of acquittal ("JOA"). He argued that the charges against Ferrier should be dismissed because he was immune from prosecution under Florida's "Stand Your Ground" law, Florida Statutes § 776.032 (Ex. B5 at 339–44). Section 776.032 provides immunity from criminal prosecution for the use of force, including deadly force, under the circumstances defined in § 776.013. *See* Fla. Stat. § 776.032(1). At the time of Ferrier's offense conduct and trial, section 776.013 provided:

(1) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself . . . when using defensive force that is intended or likely to cause death or great bodily harm to another if:

> (a) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle; and

> (b) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

(2) The presumption set forth in subsection (1) does not apply if:
. . . .

> (d) The person against whom the defensive force is used is a law enforcement officer, as defined in s. 943.10(14), who enters or attempts to enter a dwelling, residence, or vehicle in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer.

(3) A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and use force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.

(4) A person who unlawfully and by force enters or attempts to enter a person's dwelling, residence, or occupied vehicle is presumed to be

doing so with the intent to commit an unlawful act involving force or violence.

Fla. Stat. § 776.013 (effective Oct. 1, 2005 to June 19, 2014).

Defense counsel argued that the officers entered Ferrier's home without a warrant and without Ferrier's consent; therefore, Ferrier had the right to "stand his ground" and use force against the illegal entry (Ex. B5 at 340–44). Counsel argued that one of the officers, Lieutenant Blackburn, admitted that nothing prevented him from first obtaining a search warrant, and Blackburn acknowledged that he was concerned as to whether he should have obtained a warrant (*id.*). Defense counsel acknowledged that the existence of exigent circumstances was an exception to the warrant requirement, but argued that whether that exception applied was "a matter of law for the Court to determine" (*id.* at 341). Counsel argued that the exception did not apply in Ferrier's case, because there was no acute emergency (*id.* at 340–44).

The trial court rejected defense counsel's argument and denied counsel's motion to dismiss as follows:

> Well, I do find that under the law these were exigent circumstances and that no warrant was required under all the facts of this case, I'm denying that motion.

(Ex. B5 at 344).

During the charge conference, defense counsel requested the standard instruction on the justifiable use of deadly force, Standard Instruction 3.6(f), including the language concerning "no duty to retreat," the "presumption of fear," and "exceptions to the presumption of fear" (Ex. B6 at 374–76). The requested instruction was the following:

> If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony.
>
> If the defendant was in a residence where he had a right to be, he is presumed to have had a reasonable fear of imminent death or great bodily harm to himself if the victim had unlawfully and forcibly entered that residence and the defendant had reason to believe that had occurred. The defendant had no duty to retreat under such circumstances.
>
> The presumption of reasonable fear of imminent death or great bodily harm does not apply if:
>
>> the person against whom the defensive force is used is a law enforcement officer, who enters or attempts to enter a residence in the performance of his official duties and the officer identified himself in accordance with any applicable law or the person using the force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer.

> A person who unlawfully and by force enters or attempts to enter another's residence is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

(Ex. B1 at 63).

The State objected to the instruction on the ground that there was no evidence to support a self-defense instruction (*see* Ex. B6 at 376, 382). Additionally, during the discussion of the self-defense instruction, the State made a motion to preclude defense counsel from arguing to the jury that the officers should have obtained a search warrant because exigent circumstances did not justify their entry (Ex. B6 at 379–81, 386). The State argued that whether the officers were required to obtain a warrant was a legal determination for the court, not a factual determination for the jury (*id.*).

Defense counsel argued that the self-defense instructions applied because the officers were attempting to illegally enter Ferrier's residence:

> Your Honor, the applicability of the self-defense, particularly justifiable use of deadly force, has been broadened by the stand your ground legislation. In fact, that wording that is on the draft [jury instructions] that you have in your hand appears in the standard instructions now.
>
> . . . I have alleged that there was not an acute emergency, there was not an exigent circumstance, and, accordingly, the entry into that residence without a search warrant was unlawful. And that being unlawful, the law enforcement officers were not in the performance of—the lawful performance of their legal duties because an illegal entry

into a residence can hardly be classified as the lawful performance of a
legal duty.

> If the jury were to find that, they would say that the presumption
> that the law establishes would apply and would consider whether that
> was sufficient to allow them to make a finding that he was justified in
> the use of the deadly force.
> . . . .
> And my argument is that they were not in the performance of
> their lawful duty because they needed a search warrant and,
> accordingly, it was an illegal entry. . . . [L]aw enforcement cannot enter
> a residence absent consent, a warrant, or exigent circumstances.
> . . . .
> And my position is an illegal entry is not the performance of
> official duties.

(Ex. B6 at 377–79, 387) (emphasis added).

The trial court reminded defense counsel that counsel himself had argued that

the issue of the warrantless entry was a legal determination, and stated, "I made the

legal determination that these were exigent circumstances" (Ex. B6 at 379). The

court initially opined that there was not any evidence to support the requested

instruction (*id.* at 382–83).

Defense counsel argued that the court's failure to give the requested

instructions "will take away from my client his self-defense argument, which is a

core due process right that he has in this case" (Ex. B6 at 383). And counsel argued

that precluding him from arguing that the officers' entry was illegal "takes away a

very valid and important defense to my client" (*id.* at 380). Counsel argued that

Lieutenant Blackburn testified that nothing prevented him from obtaining a search warrant, and Blackburn testified he did not obtain a warrant because he believed there were exigent circumstances (*id.* at 381).  Defense counsel argued that he (counsel) should be permitted to argue that the officers were not acting in the performance of their official duties (*id.* at 382).  Counsel argued that the jury should be able to consider the factual issue of whether the officers had sufficient time to obtain a search warrant, and that he (counsel) should be able to argue that if the officers had sufficient time to get a warrant, they should have done so (*id.* at 383–84).  Counsel argued that the court was authorized to determine whether there were exigent circumstances, but the jury was also entitled to make that determination (*id.* at 384).  Counsel argued that the fact that the "official duties" language was included in the "stand your ground" instruction entitled him to argue that the officers were not engaged in official duties, because they should have had a warrant but did not (*id.* at 384–85).  Counsel argued:

> [T]o say you can't argue it to them and they cannot consider it I believe would be error on the court's part and would deprive my client of a due process right to present a defense.

(Ex. B6 at 385).

The trial court granted defense counsel's requested self-defense instructions, including the "stand your ground" instructions (Ex. B6 at 386).  However, the court

ruled that defense counsel could **not** argue that the officers should have obtained a search warrant (*id.*).  The court stated, "I've ruled that as a matter of law there were exigent circumstances" (*id.*).  Defense counsel argued that the jury question was not exigent circumstances, but whether or not an illegal entry was "in performance of official duties" (*id.* at 387).  The trial court repeated its ruling that defense counsel was not permitted to argue that the officers should have obtained a search warrant (*id.* at 388).

During closing arguments, defense counsel argued, in relevant part:

Mr. Ferrier started this.  That's one of the things that Mr. Fuchs [the prosecutor] said.  Well, Mr. Ferrier was having a little difficulty with his girlfriend and they were arguing.  And, of course, in today's electronic world, they were texting each other.  I'm sure they were also talking.  And one of the texts had a photo with it that showed him, and it's in evidence, holding a gun to his head.  Now, that's a disturbing photo.  I couldn't agree more.

But please recall that that was sent to her the day before this incident, the thirtieth.  This was the thirty-first, this incident.  And, in fact, she goes to the duty office[r] the day after she receives that.  And, for whatever reason, perhaps she didn't feel it was that big an emergency at the moment, that she could wait until the next day.

And there was also some testimony through Deputy Womble, the State's first witness, that he had been advised that there was communication on the day of this incident, the thirty-first, between Mr. Ferrier and Ms. Williams [Ferrier's girlfriend].

The police had good intentions.  I'm not going to dispute that for a second.  They have—one of their functions is to check on the welfare of people.  But the issue is what was going on in Mr. Ferrier's mind.

. . . .

Law enforcement is there for a purpose, probably a noteworthy purpose.  How long were they there?  They were there anywhere from 30 to 60 minutes.  And, in fact, they're questioning what they can even do.  That's probably one of the reasons why Lieutenant Blackburn showed up.  He hears all of this chatter on the radio.  He decides it's probably something that I need to get involved in, so he goes there and he's apprized [sic] of the situation.  And they're talking.  And they talk for perhaps an hour.

Now, all the shades are down on all the windows.  But, even—I believe it was Lieutenant Blackburn who said, I've got shades like that at my house.  Even if they're down, you can look out the shades.  So, I think it's entirely reasonable to assume that Mr. Ferrier knew law enforcement was outside there.

Well, is Mr. Ferrier required to respond to them knocking on the door?  Is there a law that says if they come and say, Mr. Ferrier, come out here, we need to talk to you, he has to do that?  Would it be reasonable?  Yes, I suppose.  But is he compelled to do that?  Is it a crime?  Is it an element of this offense that he said, I'm not talking to you guys, I'm not responding?

So, as he does not respond, they decide that they're going to enter, after a discussion of up to an hour.

The emergency was a photo sent the prior day.  Information that day was that Mr. Ferrier was in communication still with Ms. Williams, which you might find fairly reasonable because when people in an arrangement, in a relationship, argue, they still have a tendency to talk, if nothing else, to argue some more.  That's pretty common.  So, Mr. Ferrier chooses, I want to talk to her, I don't want to talk to you guys.

Well, before they come in, what do they do?  They all draw their guns, they take strategic positions around, and they say, shout, 30 seconds, if you're not coming out, we're coming in.  So it's no longer a case of Mr. Ferrier can ignore them and perhaps they'll go away.  They're coming in.  And they're coming in with guns drawn.

Well, what difference does that make?  It makes a difference.  It makes a difference on the self-defense argument.  It makes a difference about at that point he's presented with a choice whether or not—he's chosen not to respond to them, they're coming in anyhow.  Well, does that mean then that he formed the intent to kill them?  All right, they're coming in, I'm going to kill them?

Mr. Fuchs says something about he was laying a trap, he was going to ambush them.  Well, Mr. Ferrier isn't the one who decided that they were coming in.  Mr. Ferrier isn't the one who said we're coming out to check on you.  There's no trap involved here.

If Mr. Ferrier intends to kill officers, wouldn't it have been easier for him to start popping at them when they were out milling about in the yard in the open?  What changed to go from I'm ignoring you, but I'm not taking any action against you, how does he go from that point to I'm going to kill every one of you?  I would submit to you that's just not reasonable.
. . . .

You got a self-defense instruction.  That instruction is going to tell you that—I don't operate off my memory and I would suggest you don't either.  And I'm sure you won't.  It is titled Justifiable Use of Deadly Force.  And it's a lengthy instruction.  But it says in there, in the third paragraph on Page 14—actually, let's start at the second paragraph.  If the defendant, Mr. Ferrier, is not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat, has a right to stand his ground, meet force with force, including deadly force, if you reasonably believe it's necessary to do so to prevent death or great bodily harm to himself or prevent the commission of a forcible felony.  And one of the paragraphs also talks

about you have to consider this in light of the circumstances that Mr. Ferrier was facing.

Mr. Ferrier, again, has officers of the law outside his apartment for 30 to 60 minutes, saying, Mr. Ferrier, Mr. Ferrier, come out, we need to talk to you.  He chooses not to respond.  Again, not a violation of the law.  Perhaps not the best thing to have done, but it was his choice.  He makes that choice and the situation escalates to where if you don't come out, we're coming in.  He's in his residence.  He's not doing anything illegal.  He has a right to ignore the police.  And he does, until they say, we're coming in.  And if perchance, he looked through the shades, he would have seen them going to strategic positions and pulling their guns.

It also says in here on self-defense, on the top paragraph on 14, it says, "The danger facing the defendant need not have been actual.  However, to justify the use, the appearance of the danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of force."

Well, what's the danger?  The danger is armed law enforcement officers are going to force their way into his house.  Well, perhaps people would say, well, gee, you should have answered them to begin with, we would have never gotten that far.  And when they say they're going to come in the door, maybe you ought to just sit there and wait for them to come in.  He chose not to do that.

A man's home is his castle.  The deputies were well-intended.  But, again, the issue you've got to resolve is the mental processes, the intent of Jerome Ferrier.

(Ex. B6 at 450–51, 463–65, 474–75).

The state court's limitation of defense counsel's closing argument was not contrary to or an unreasonable application of clearly established federal law.  For

starters, defense counsel wanted to argue a legal standard which was inapplicable to the evidence presented at trial.  It was undisputed at trial that all of the victims of Ferrier's use of deadly force were law enforcement officers.  Defense counsel wanted to argue that the jury should apply the presumption that Ferrier was in reasonable fear of imminent death or great bodily harm, because the officers attempted to enter Ferrier's residence without a warrant and thus were not engaged in the **lawful performance of their legal duties**.  But according to the jury instructions, which defense counsel himself requested, application of the presumption in cases where the victim is a law enforcement officer is determined by a different legal standard, i.e., whether the officer was acting "**in the performance of his official duties**" and the officer identified himself or Ferrier knew or reasonably should have known that the person was a law enforcement officer (*see* Ex. B1 at 63).

Florida courts have held that in applying the presumption at issue, the phrase "performance of . . . official duties" as used the Florida Statutes § 776.032 differs from the phrase "lawful execution of a legal duty" found in other Florida statutes. *See Finkelstein v. State*, 157 So. 3d 1085, 1088 (Fla. 1st DCA 2015).  For purposes of § 776.032, "'[a]n officer is engaged in the performance of his official duties when acting within the scope of his employment.'"  *Id.* (quoting *State v. A.A.R.*, 113 So.

3d 942, 944 (Fla. 5th DCA 2013)).  The scope of an officer's official duties is not

coextensive with his legal powers.  *See Finkelstein*, 157 So. 3d at 1088; *Clinton v.*

*State*, 421 So. 2d 186, 188 (Fla. 2d DCA 1982).

Unlike the Supreme Court's decision in *Herring*, this is not a case where the

trial court completely denied defense counsel an opportunity for closing summation.

Instead, the trial court simply precluded defense counsel from arguing an incorrect

legal standard with respect to the "performance of official duties" element of the

Stand Your Ground defense.

Further, the trial court did not preclude defense counsel from arguing to the

jury that the presumption applied because the officers were not performing their

official duties when they attempted to enter Ferrier's residence.  And the court

certainly did not preclude defense counsel from arguing the essence of his

justification defense, as evident from the fact that counsel argued it.

Ferrier has not demonstrated that the state court's limitation of defense

counsel's closing argument was contrary to or an unreasonable application of clearly

established federal law.  *See United States v. Harris*, 916 F.3d 948, 959 (11th Cir.

2019) (district court did not violate defendant's constitutional right to present a

complete defense when it prevented him from arguing during closing argument that

although he might have committed theft, he did not commit extortion, in prosecution

for Hobbs Act extortion; court permitted defendant to argue that he might have done something wrong, but did not commit the extortion offense as charged in the indictment, and defense counsel argued that extortion was not just stealing or robbing).  Ferrier is not entitled to federal habeas relief on Claim I.

> **B.    Claim II:  "The trial court improperly enhanced/reclassified Petitioner's sentence w/o [sic] the jury making findings for F.S. 782.065 (2010) requiring law enforcement be in performance of legal duties in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and U.S. Const. Amends. V, VI, XIV, due process and equal protection."**

Ferrier contends the trial court enhanced his sentence under Florida Statutes § 782.065 based upon a fact that was not determined by the jury, specifically, that each law enforcement victim was engaged in the lawful performance of a legal duty (ECF No. 52 at 7; ECF No. 53 at 4).  Ferrier acknowledges that the jury found as fact that each victim was a law enforcement officer, but he contends the jury did not make the additional finding that each officer was engaged in the lawful performance of a legal duty (*id.*).  Ferrier asserts he presented this claim on direct appeal (ECF No. 52 at 7).

The State contends Ferrier did not present the federal nature of his claim to the state courts (ECF No. 74 at 20–24).  The State contends Ferrier's failure to do so constitutes a procedural default and renders Claim II procedurally barred from federal review (*id.*).  The State alternatively argues that the claim Ferrier presented

in the state courts was adjudicated on the merits, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 67–70). Therefore, Ferrier is not entitled to federal habeas relief (*id.*).

In Ferrier's reply, he contends the claim is exhausted (ECF No. 78 at 11–13). He asserts his trial counsel argued federal grounds for the claim at the sentencing hearing (*id.*). Ferrier asserts he argued the same federal grounds to the First DCA in his pro se motion for rehearing in the direct appeal (*id.*).

At Ferrier's sentencing hearing, his defense counsel argued that the court could not sentence Ferrier to a mandatory life sentence under Florida Statutes § 782.065, because the jury had not made one of the two factual findings required under the statute (Ex. B1 at 129–32). Counsel referenced *Apprendi* and *Blakely* in his argument (*id.* at 130). In its responsive argument, the State also referenced *Apprendi* (*id.* at 130). The trial court imposed life sentences on all Counts (*id.* at 132–33).

As Issue IV on direct appeal, Ferrier's appellate counsel argued that the court erred in sentencing Ferrier pursuant to section 782.065, because there was no jury finding, beyond a reasonable doubt, that the law enforcement victims were engaged

in the lawful performance of a legal duty (Ex. B11 at 25). Appellate counsel relied solely on the language of the statute itself and did not cite any other legal authority (*id.*).

The State argued that the trial court did not err in sentencing Ferrier to life imprisonment on Counts I, II, III, IV, VI, and VII, because the jury found that Ferrier actually possessed and discharged a firearm during the commission of those offenses, which "reclassified" the offenses from a first degree felony to a life felony, pursuant to § 775.087(1), because the jury found as fact that Ferrier actually possessed and discharged a firearm during the commission of Counts I, I, III, IV, VI, and VII (Ex. B12 at 22–25). The State did not reference federal law in its argument on Issue IV (*see id.*).

In Ferrier's reply brief, counsel again argued that the jury failed to make the necessary findings to support a mandatory life sentence under § 782.065, relying upon the arguments in his initial brief (Ex. B13).

The First DCA reversed the convictions on Counts IX and X due to fundamental error in the jury instructions (presented as Issue II in Ferrier's initial brief), and affirmed "all other issues raised on appeal" (Ex. B14). *Ferrier*, 111 So. 3d at 920.

Ferrier filed a pro se motion for rehearing, in which he cited *Apprendi* and *Blakely* in support of his argument that the court erred in sentencing him under section 782.065 (Ex. B15).  The First DCA denied Ferrier's motion for rehearing without explanation on May 6, 2013, and issued the mandate on May 22, 2013 (Exs. B17, B18).

The Eleventh Circuit has suggested that presenting a claim in a motion for rehearing on direct appeal is sufficient to exhaust the claim in state court.  *See Plasencia v. Sec'y, Fla. Dep't of Corr.*, 606 F. App'x 511, 512–13 (11th Cir. 2015). Following this lead, the undersigned concludes Ferrier satisfied the exhaustion requirement.   The court will thus proceed to determine whether Ferrier has demonstrated that the First DCA's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or that the state court's adjudication was based upon an unreasonable factual determination.

### 1.   Clearly Established Federal Law

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the Supreme Court held that the "notice and jury trial guarantees of the Sixth Amendment" require that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 476, 490.

The "statutory maximum," for purposes of *Apprendi*, "is the maximum sentence a judge may impose **solely on the basis of the facts reflected in the jury verdict or admitted by the defendant**." *Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (emphasis in original). Therefore, a judge may not lawfully "inflict[ ] punishment that the jury's verdict alone does not allow" because "the jury has not found all the facts which the law makes essential to the punishment." *Id.* (quotation marks omitted).

At the time the First DCA concluded its review of the issues presented in Ferrier's direct appeal (including his claim that the trial court improperly enhanced his sentence under § 782.065 without the jury finding that each law enforcement officer/victim was in performance of his legal duties when Ferrier shot at them), the Supreme Court had held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment. *See Harris v. United States*, 536 U.S. 545, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002).[6]

_____

[6] The Supreme Court subsequently overruled *Harris* in *Alleyne v. United States*, 570 U.S. 99, 103, 107, 116, 133 S. Ct. 2151, 188 L. Ed. 2d 314 (2013), and held that any fact that increases the mandatory minimum sentence for a crime is "element" of the crime, not "sentencing factor," that must be submitted to jury. *Id.* But *Alleyne* was decided on June 17, 2013, **after** the First DCA issued its mandate in Ferrier's direct appeal, on May 22, 2013. *Alleyne* is thus not "clearly established federal law" for purposes of reviewing the First DCA's adjudication of Claim II under § 2254(d). *See Williams*, 529 U.S. at 412 ("clearly established Federal law" in § 2254(d)(1) refers to the holdings of the Supreme Court's decision as of the time of the relevant state court decision).

It was also settled that *Apprendi* and *Blakely* errors are not structural error and are subject to harmless error review. *See Washington v. Recuenco*, 548 U.S. 212, 222, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (concluding, in the context of a direct appeal, that failing to submit a sentencing factor to the jury was not structural error and was thus subject to harmless error review); *United States v. Anderson*, 289 F.3d 1321, 1326–27 (11th Cir. 2002) (citations omitted).

    2.     Federal Review of State Court Decision

Section 782.065 provides:

> Notwithstanding ss. 775.082, 775.0823, 782.04, 782.051, and chapter 921, a defendant shall be sentenced to life imprisonment without eligibility for release upon findings by the trier of fact that, beyond a reasonable doubt:
>
> (1) The defendant committed . . . attempted murder in the first or second degree in violation of s. 782.04(1)(a) 1. or (2); . . . and
>
> (2) The victim of any offense described in subsection (1) was a law enforcement officer. . . engaged in the lawful performance of a legal duty.

Fla. Stat. § 782.065.

At Ferrier's sentencing, the prosecutor argued that under § 782.065, the court was required to impose a life sentence "because they were found to be law enforcement officers independently by the jury" (*see* Ex. B1 at 128).

Defense counsel argued that the court was not required to impose life sentences under § 782.065, because the statute required that the jury make two findings: (1) that each victim was a law enforcement officer, and (2) that each victim was engaged in the lawful performance of a legal duty (*see* Ex. B1 at 129). Defense counsel conceded that the jury found that each victim was a law enforcement officer, but counsel argued that the jury did not make findings on the second element, i.e., that each victim was engaged in the lawful performance of a legal duty (*id.* at 129–30).

The prosecutor responded:

> I will also point out that *Apprendi* really is not applicable in this situation. Even though we did the interrogatories we did, *Apprendi* only applies whenever something is taken above and beyond what would be the allowed sentence of the Court.

> In this particular case, we had attempted first degree murders that were found. The jury found they [sic] were, in fact, in possession of a firearm. When an attempted first degree murder is, in fact, found in possession of a firearm, it elevates it to a life felony, which allows the Court to sentence him up to life. So, therefore, it doesn't expand on what the court was allowed to do.

> So, regardless, there actually didn't have to be a finding, given the verdict. But we went ahead and did it anyway.

(Ex. B1 at 130–31).

The "possession of a firearm" enhancement referenced by the prosecutor is found in Florida Statutes § 775.087.  That statute provides:

> (1) Unless otherwise provided by law, whenever a person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, and during the commission of such felony the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm, . . . the felony for which the person is charged shall be reclassified as follows:

> (a) In the case of a felony of the first degree, to a life felony.

Fla. Stat. § 775.087(1)(a).  A life felony committed on or after July 1, 1995, is punishable by a term of imprisonment for life or by imprisonment for a term of years not exceeding life imprisonment.  *See* Fla. Stat. § 775.082(3)(a)3.

Defense counsel argued that if the court imposed sentences under § 782.065, the life sentences were mandatory; but if the court imposed sentences under the "possession of a firearm" statute, § 775.087, life sentences were discretionary (Ex. B1 at 131).

The court ruled as follows:  "It's the judgment of law and sentence of the Court that, as to the six counts of attempted first degree murder, will be [sic] life imprisonment." (Ex. B1 at 132–33).  The written judgment does not indicate under which statute the court imposed life sentences, nor does it indicate that the court

imposed any special provisions (for example, minimum mandatories, service of 100 percent of the sentence, or ineligibility for parole) (*see* Ex. B1 at 107–15).

Ferrier's counsel argued to the First DCA that the trial court erred in sentencing Ferrier pursuant to § 782.065, because there was no jury finding that any victim was engaged in the lawful performance of a legal duty (Ex. B11 at 25). Counsel argued that Ferrier should be resentenced to "no more than the statutory maximum . . . without the benefit of the special statute" (*id.*).

The First DCA affirmed the trial court on this issue, without explaining its reasons for doing so (*see* Ex. B14).

As previously discussed, the federal court must "look through" the unexplained decision to the last related state-court decision that provides a relevant rationale and presume that the unexplained decision adopted the same reasoning. *See Wilson*, 138 S. Ct. at 1192. But as previously indicated, the trial court did not provide a rationale for its imposition of life sentences. Since there is no reasoned lower court opinion to look to, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

The First DCA could have reasonably rejected Ferrier's Sixth Amendment claim on the ground that any error in the trial court's sentencing Ferrier under

§ 782.065 was harmless beyond a reasonable doubt, because Ferrier was subject to life sentences pursuant to the sentence enhancement provided in § 775.087(1)(a), based upon the jury's express finding, as to each Count at issue, that Ferrier actually possessed and discharged a firearm during the commission of the offense (*see* Ex. B1 at 69–72).[7]

Without any enhancement or reclassification, first degree murder is a capital felony, punishable by life imprisonment without eligibility for parole.  *See* Fla. Stat. § 782.04(1); § 775.082(1)(a).  **Attempted** first degree murder, which is what Ferrier was found guilty of in Counts I, II, III, IV, VI, and VII, is a first degree felony, punishable by a term of imprisonment not exceeding 30 years "or, when specifically provided by statute, by imprisonment for a term of years not exceeding life imprisonment."  *See* Fla. Stat. § 777.04(4)(b),  775.082(b).

The "possession of a firearm" statute, § 775.087(1)(a), reclassified each of Ferrier's offenses to life felonies, which were punishable by a term of imprisonment for life or by imprisonment for a term of years not exceeding life.  *See* Fla. Stat. § 775.082(3)(a)3.  A fairminded jurist could agree with the First DCA's conclusion

---

[7] Whether the imposition of sentence violated the Florida statute itself was purely an issue of state law.  A federal habeas court has no license to re-determine a state court's determination of an  issue of state law.

that any constitutional error in sentencing Ferrier under § 782.065 was harmless beyond a reasonable doubt.[8]

Ferrier has not demonstrated that the state court's adjudication of Claim II was contrary to or an unreasonable application of clearly established federal law. Therefore, Ferrier is not entitled to federal habeas relief on Claim II.

### C.    Claim III:  "Trial counsel was ineffective by failing to object to uniform [sic] officers in the trial audience in violations [sic] of U.S. Const. Amends. V due process and VI assistance of counsel, *Holbrook vs. Flynn*, 475 U.S. 560, 570–71 (1986)."

Ferrier contends defense counsel was ineffective for failing to object to the presence of uniformed law enforcement officers during trial (ECF No. 52 at 8; ECF No. 53 at 5–6).  Ferrier asserts the presence of the uniformed officers sent a message to the jury (*id.*).  He contends the outcome of trial would have been different if counsel had objected (*id.*).

The State argues that Claim III is similar to Ground VIII of Ferrier's amended Rule 3.850 motion; however, Ferrier voluntarily waived the claim when the circuit

---

[8] The undersigned recognizes that § 782.065 required the sentencing court to impose life sentences, whereas § 775.087(1)(a) gave the court discretion to do so.  But as previously discussed, at the time the First DCA concluded its review of the issues presented in Ferrier's direct appeal, the Supreme Court had held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment.  *See Harris*, 536 U.S. 545 (2002). It was not until after the First DCA issued the mandate in Ferrier's direct appeal that the Supreme Court issued its *Alleyne* decision, which overruled *Harris*.

court granted his motion to strike it (*see* ECF No. 74 at 24–26).  The State contends

Claim III is thus unexhausted, and because state procedural rules preclude Ferrier

from returning to state court to attempt to exhaust the claim, it is procedurally barred

from federal review (*id.*).  The State alternatively argues that the state court's

adjudication of the merits of the "similar claim" is entitled to deference under section

2254(d) (*id.* at 71–77).

The state court record demonstrates that Ferrier presented this ineffective

assistance of trial counsel ("IATC") claim as Ground VIII of his amended Rule 3.850

motion (Ex. D3 at 427–28).  Ferrier subsequently filed a motion to strike several

grounds, including Ground VIII (Ex. D3 at 454–55).  The circuit court granted

Ferrier's motion to strike and struck the grounds as requested, including Ground VIII

(*id.* at 482–84).  However, at the post-conviction evidentiary hearing, Ferrier's post-

conviction counsel announced he was proceeding on Ground VIII (*see* Ex. D4 at

584).  The court heard evidence on this issue, specifically, the testimony of Deputy

Alvin Roberts (the bailiff at Ferrier's trial), Attorney Leonard Holton (Ferrier's trial

counsel), and Jon Fuchs (the prosecutor during Ferrier's trial) (*see* Ex. D4).  The

court made findings on this issue both at the conclusion of the evidentiary hearing

(*id.* at 629–30) and in its written order denying Ferrier's amended Rule 3.850 motion

(Ex. D3 at 521).  Ferrier argued this issue in his initial brief in the post-conviction

appeal (Ex. D6 at 22–28).  The First DCA affirmed the lower court's decision (Ex. D9).  The record demonstrates that Ferrier satisfied the exhaustion requirement.

> ### 1.      Clearly Established Federal Law

Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citation omitted).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Id.* at 689. "[T]here are no absolute rules dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (internal quotation marks and citation omitted). Indeed, "[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions." *Id.* (internal quotation marks and citation omitted).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial . . . were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citation omitted). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

The petitioner's burden of demonstrating prejudice under *Strickland* is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude

'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And the petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with

> unreasonableness under § 2254(d). When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable. The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

It is also firmly established that "[c]entral to the right to a fair trial . . . is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion . . . or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978)). As stated in *Woods v. Dugger*, 923 F.2d 1454, 1456 (11th Cir. 1991), the Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried by a panel of impartial, indifferent jurors whose verdict must be based upon the evidence developed at the trial.

In furtherance of a jury verdict based solely on the evidence introduced at trial, "due process requires a trial court to safeguard against intrusion of factors into the trial process that would tend to subvert its purpose." *Estes v. Texas*, 381 U.S. 532, 560, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (Warren, C. J., concurring). Judges are not free to disregard factors external to the evidence, such as the atmosphere in and

around the courtroom, which may influence a jury's verdict. The Sixth Amendment imposes upon trial courts an affirmative obligation "to minimize any risk of 'unacceptable factors' affecting the accused's right to have a fair trial." *Woods*, 923 F.2d at 1454, n.11.

The presence of courtroom observers wearing uniforms, insignia, buttons, or other indicia of support for the accused, the prosecution, or the victim of the crime does not automatically constitute denial of the accused's right to a fair trial. *See Holbrook*, 475 U.S. 560 (1986) (four uniformed officers seated immediately behind defendant); *Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (fair trial not denied by wearing of buttons with photo of victim by some members of victim's family). However, there are situations where the atmosphere in the courtroom might infringe on the defendant's right to a fair trial. When this issue is raised, a case-by-case approach is required to allow courts to consider the "totality of the circumstances." *Sheppard v. Maxwell*, 384 U.S. 333, 352, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *Holbrook*, 475 U.S. at 569.

Considering the circumstances, a defendant claiming he was denied a fair trial must show "either actual or inherent prejudice." *Woods*, 923 F.2d at 1457. Actual prejudice requires some indication or articulation by a juror or jurors that they were conscious of some prejudicial effect. *See Shootes v. State*, 963 So. 2d 831 (Fla. 1st

DCA 2009) (citation omitted).  Inherent prejudice, on the other hand, requires a showing by the defendant that there was an unacceptable risk of impermissible factors coming into play.  *See Holbrook* 475 U.S. at 570; *Woods*, 923 F.2d at 1457; *Shootes*, 20 So. 3d at 438.

### 2.    Federal Review of State Court Decision

At the post-conviction evidentiary hearing, Deputy Alvin Roberts testified he was the bailiff during Ferrier's trial, and there was one other uniformed officer positioned near Ferrier (Ex. D4 at 538–39).  Deputy Roberts testified the SWAT Team escorted Ferrier into and out of the courtroom, but the jury was not present during the escorts (*id.* at 539–40).  Roberts testified two members of the SWAT Team were present in the back of the courtroom, but they were dressed in plain clothes and "you couldn't tell" they were members of the SWAT Team (*id.* at 541). Roberts testified that there were 20–30 spectators in the gallery during trial, including Ferrier's family, the general public, and employees of the Tallahassee Police Department and Leon County Sheriff's Office (*id.* at 540).  Deputy Roberts testified there were approximately four officers in the gallery, but all but one of them were dressed in plain clothes, and the guns they were carrying were covered by their clothing (*id.* at 541–42).  Deputy Roberts testified that once the jury reached a verdict, they "amped up" security for the reading of the verdict (*id.* at 543–44).

Attorney Holton testified he believed that there were two bailiffs present as well as a third uniformed deputy (Ex. D4 at 549–50). Attorney Holton testified he did not recall observing enough officers in uniform that he felt it necessary to object to their presence (*id.* at 570).

Jon Fuchs, the prosecutor during Ferrier's trial, testified he recalled that one uniformed officer from the Tallahassee Police Department was in the gallery during the taking of testimony (Ex. D4 at 590–92, 594–95). Fuchs testified that one of the officer victims (Brandon Cutcliffe) was also present in uniform, but only during closing arguments (*id.* at 591–92, 594–95). Prosecutor Fuchs testified that the only other uniformed officers were the two bailiffs and a third deputy for security (*id.*).

Ferrier testified that with respect to the presence of uniformed officers while the jury was in the courtroom, he recalled there were four or five uniformed officers sitting near the jury box when the court read the jury instructions (Ex. D4 at 605).

The court made oral findings at the conclusion of the evidentiary hearing (Ex. D4 at 628–32). The court found that the testimony of Deputy Roberts, Mr. Fuchs, and Attorney Holton was "much more credible" than Ferrier's (*id.* at 628). The court additionally found:

> I don't find that there was an excessive law enforcement presence. I'm very familiar with courtroom 3-G; it's a large courtroom.

> I have many times said that you could bowl between the bar and the judge's bench because the gallery is so far back, and the courtroom has a lot of wasted space in it.
>
> So I don't think that there was; one, an undue amount of law enforcement present; and, two, I don't think they were in a posture that they would have influenced the jury in any way.

(Ex. D4 at 629).

The circuit court repeated these findings in its written order denying Ferrier's amended Rule 3.850 motion (*see* Ex. D3 at 521) and concluded that Ferrier failed to satisfy either the deficient performance or the prejudice prong of the *Strickland* standard (*id.* at 525). Ferrier presented this claim in his initial brief in the post-conviction appeal (Ex. D6 at 22–28). The First DCA affirmed the lower court's decision without explanation (Ex. D9).

Ferrier has not demonstrated, by clear and convincing evidence, that the state court's factual findings are unreasonable. Therefore, this court accepts as fact that there was no credible evidence of an excessive presence of uniformed officers in the courtroom during trial, and no evidence that the presence of officers influenced the jury's verdict in any way. Considering these facts, the state court reasonably determined that Ferrier failed to demonstrate that Attorney Holton's failure to object to the presence of uniformed officers constituted incompetence on his part. And the state court reasonable determined Ferrier failed to show a reasonable probability the

result of trial would have been different if Attorney Holton had objected to the presence of law enforcement officers. *Compare Holbrook*, 475 U.S. at 571 (presence of four supplemental security officers in trial of six defendants not inherently prejudicial); *with Woods*, 923 F.2d at 1458–60 (finding that pretrial publicity, combined with fact that half of the spectators in the overflowing gallery wore prison guard uniforms, deprived the defendant of a fair trial) *and Shootes*, 20 So. 3d at 439–40 (finding inherent prejudice where approximately half or more of the spectators were officers, officers sat together as a group in seats closest to jury, and some officers wore formal and informal uniforms). Ferrier is not entitled to federal habeas relief on Claim III.

> **D.    Claim IV:  "Counsel's misadvice that nature of prior convictions will be exposed rendered waiver involuntary in violation of US. Const. Amends. VI obtaining witnesses in his favor and assistance of counsel for his defense."**

Ferrier contends Attorney Holton was ineffective for advising him that the jury would hear the nature of his prior convictions if he testified at trial (ECF No. 52 at 9; ECF No. 53 at 7–9).

The State argues that Claim IV is similar to Ground IX of Ferrier's amended Rule 3.850 motion; however, Ferrier voluntarily waived the claim when the circuit court granted his motion to strike them (*see* ECF No. 74 at 26–28). The State

contends Claim IV is thus unexhausted, and because state procedural rules preclude Ferrier from returning to state court to attempt to exhaust the claim, it is procedurally barred from federal review (*id.*).  The State alternatively argues that the state court's adjudication of the merits of the "similar claim" is entitled to deference under section 2254(d) (*id.* at 77–84).

The state court record demonstrates Ferrier presented this IATC claim as Ground IX of his amended Rule 3.850 motion (Ex. D3 at 429–31).  Ferrier included this claim in his motion to strike (Ex. D3 at 454–55).  The circuit court granted Ferrier's motion to strike and struck Ground IX (*id.* at 482–84).  However, Ferrier's post-conviction counsel filed a memorandum prior to the evidentiary hearing which included argument on Ground IX (*see id.* at 512).  And at the post-conviction evidentiary hearing, Ferrier's post-conviction counsel announced he was proceeding on Ground IX (*see* Ex. D4 at 584).  The court heard evidence on this issue, specifically, the testimony of Attorney Holton and Ferrier himself (*see* Ex. D4).  The court made findings on this issue both at the conclusion of the evidentiary hearing (*id.* at 630) and in its written order denying Ferrier's amended Rule 3.850 motion (Ex. D3 at 521–22).  Ferrier argued this issue in his initial brief in the post-conviction appeal (Ex. D6 at 28–33).  The First DCA affirmed the lower court's decision (Ex. D9).  Ferrier satisfied the exhaustion requirement.

1.      Clearly Established Federal Law

The *Strickland* standard governs this claim.

2.      Federal Review of State Court Decision

At the post-conviction evidentiary hearing, Attorney Holton testified he did not have a specific recollection of discussing with Ferrier whether he (Holton) recommended that Ferrier testify at trial, but Holton testified his practice would have been to discuss it with Ferrier as the trial date approached, or certainly prior to the time for presenting the defense's case (Ex. D4 at 555).  Attorney Holton testified that during his nearly thirty years of practicing criminal defense and well over 100 felony trials, including capital cases, he always told clients that if they testified, the State may inquire if they have ever been convicted of a felony or a crime of dishonesty and how many times (*id.* at 555, 564–65).  Attorney Holton testified he also warns clients that if they testify to the wrong number of convictions, the prosecutor may then, **and only then**, inquire into the nature of the prior convictions (*id.* at 555–56).  Holton testified, "I always caution that . . . that's a possibility but it can only occur if the State can establish that the testimony of the Defendant was incorrect." (*id.*).  Attorney Holton testified his usual practice was to reach an agreement with the prosecutor as to the number of qualifying prior convictions, so

his client would not be questioned further if the client testified to that number (*id.* at 573–74).

Holton testified he tells clients they should consider the pros and cons of testifying, and if the client wants to testify, he (Holton) would not and could not stop the client from doing so (Ex. D4 at 556).   Ferrier's post-conviction counsel questioned Holton about whether it would have been appropriate for Holton to recommend that Ferrier testify if Ferrier had told him he shot his gun only to scare the officers (*id.* at 556–61).   Attorney Holton additionally testified he did not recall Ferrier telling him that he intended only to scare the officers when he shot at them; Holton testified that Ferrier told him he fired at the officers because he did not believe they had a legal right to enter his home (*id.* at 554, 557–59).   Holton expanded on this issue as follows:

> Q [by counsel for the State].   Now, you don't recall the Defendant telling you that he was just attempting to scare the law enforcement away?
>
> A.  I do not.
>
> Q.  If he would have—would that have been sort of a big deal had he raised it?
>
> A.  Well, that would have been a big deal.  I think it would have been a hard sell based on the evidence.  But, yeah, that's obviously something that would go to the intent.  I don't recall that he was looking to scare them.

But, you know, when you're talking about scaring them, hypothetically, a situation, I am going to fire straight up into the air, and it's the sound of the gun being fired to scare them. You know, at what point as you—as the angle drops and the shot is fired in the direction or closer to the direction or at objects that are near or connected to them, you know, there's no bright line that says once you get to this point, you're clearly shooting at them; and above that point, you're just shooting to scare them. And the evidence, I didn't think, supported the notion of an argument that, you know, he was just looking to scare them.

When you have these—a trial like that, if I make that type of an argument—and, of course, it's an argument to the Judge so the prosecutor can argue what he wants back. But sometimes if it gets the point to where you follow it up, and you say, "well," you know, "ladies and gentlemen of the jury, I know you've heard some testimony, but the majority of the testimony does not support that he was actually firing at these officers."

And, you know, then the prosecution gets to come back and in great detail recount in response, "'okay, here is why that is not the case, ladies and gentlemen of the jury."

So sometimes you—strategy-wise, you really don't want to put that out there, throw that big pitch up for the prosecutor to knock it out of the park.

Q. Okay. Do you recall whether or not you gave the Defendant any affirmative advice one way or the other in this case about whether he should testify or he should not testify?

A. I don't recall whether I gave him affirmative advice to or not to. I noted in the—in the amended [Rule 3.850] motion, saying I was alleged to have said, "They'll tear you up." I have no recollection of saying that.

I—I don't want to discount the fact that based upon my appraisal of the Defendant's, you know, tolerance level, you know, and let me explain that as being how easily a person could be goaded into being aggressive, being loud, doing things on the stand that would, shall I say, influence the jury to believe, yeah, this is a violent person. Yeah, that would be a consideration.

But if—if a person is going to testify so—if Mr. Ferrier would have said to me, "I really want to testify. This is a case I have to tell my story," we would have spent a fair amount of time going over how to testify.

I tell clients, you know, wait until they ask the question before you answer. Only answer the question they ask and don't argue. And I try to drill that, and I will even in certain instances I have taken the role of the prosecutor and cross examined them, just literally went after them. This is outside of court, just to let them know this is what you're probably looking at. And I don't recall if that was the situation in this case.

So I don't have any recollection that it was an issue that Mr. Ferrier, "Oh, I've got to get on the stand, Mr. Holton," I don't recall that.

Q. Okay. And just to clear up or now put a few more nails into it, the—but a discussion would have been had with the Defendant as to what the defense was in this case and about whether or not—the advantages and disadvantages of testifying, and ultimately it was his decision; is that correct?

A. Yes.

Q. And would there have been a discussion about whether or not he was likely to testify at the trial?

A. That would obviously come up at some point, because you— I believe defense counsel has an obligation to advise the client you have

an absolute right to testify.  You know, I may advise you not to testify if you ask me, and I generally don't try to tell them whether they should or shouldn't unless they ask, and they almost always ask.

But, no, I would—I would tell them, you know, if you want to, here is what—you know, you have an absolute right.  Here is what you know, these issues—we would discuss what the nature of their testimony would be.

We would discuss what I believe the prosecutor would use to attack them and, you know, just to prep them, and that's—that's pretty standard.

Q.  Okay.  And would you have followed that same procedure in Mr. Ferrier's case?

A.  Absolutely.  This was a high-profile case.  You know, this— yeah, that would be in every case, but it certainly would have been in this case.  There would be no reason—in fact, there would have been reasons to make sure that he understood that in this case.

(Ex. D4 at 578–81).  Attorney Holton testified he did not advise Ferrier not to testify

(*id.* at 556).

Ferrier testified he and Attorney Holton discussed the issue of his testifying

in the courtroom, immediately before the trial judge asked him if he wished to testify

(Ex. D4 at 602).  Ferrier stated he did not testify at trial for the following reason:

Because Mr. Holton told me that I would be impeached if I took the stand.  He told me that the prosecutor had all of my prior records, and if the jury heard that I was convicted of firearm charges, that I would be impeached.  And he also told me that the prosecutor would eat me alive if I took the stand.
. . . .

[H]e told me that if I testified, the jury was going to find me guilty if they knew about my weapon charges in Mississippi.

And those weapon charges was [sic] from 1998, and he told me that the prosecutor had all of my records and that he was going to present those records and have me impeached.

(Ex. D4 at 602).  Ferrier continued:

A.  I would have testified, if he wouldn't have told me that I would have gotten impeached, I would have testified.

Q [by Ferrier's post-conviction counsel].  Well, to be fair, you can be impeached with your criminal record.  Are you saying that he told you the nature of your convictions would come out?

A.  Yes, sir.  He told me that my firearm convictions would— would provoke the Judge to impeach me, yes, sir.

Q.  Now, that being said, did he advise you that that only comes out if you either get the number of convictions wrong, or if you downplay the seriousness of the prior convictions?  Or did he just tell you they were coming out no matter what?

A.  I can't really remember if we had that discussion.

(Ex. D4 at 604).

In fact, during cross-examination by the State, Ferrier demonstrated how easily the jury could have heard the nature of his prior convictions.  Counsel for the State asked Ferrier **how many** counts he was convicted of in this case, and Ferrier responded by not only stating the number of convictions but the **nature** of each conviction (Ex. D4 at 609).

Case No.:  4:17cv178/RH/EMT

At the conclusion of the evidentiary hearing, the court announced that it found Attorney Holton's testimony more credible than Ferrier's (Ex. D4 at 628). With respect to this particular IATC claim, the court determined that Ferrier failed to present enough evidence to demonstrate that Attorney Holton performed below the standard of professional assistance (*id.* at 628–29). The court found there was ample evidence in the record that Attorney Holton discussed the possibility of testifying with Ferrier, and there was no basis to believe that Holton prevented Ferrier from testifying (*id.* at 630). The court also noted that the trial court conducted a colloquy with Ferrier and determined that his decision not to testify was voluntary (*id.*).

In the court's written decision, it made additional findings and conclusions:

> As to the complaints of the Defendant that Mr. Holton gave him incorrect advise [sic] that influenced him not to become a witness in the case, Mr. Holton testified that he had a long discussion with the Defendant about becoming a witness. He told him he would have to testify truthfully and would be asked about prior convictions. He stated he discussed the pros and cons of the Defendant testifying, and did not advise him not to testify. He stated that if the Defendant wanted to testify, that he would not try and stop him. If the Defendant had wanted to testify, he would have spent a long time preparing him for his testimony. The Court finds this testimony credible and finds that the Defendant made a voluntary decision not to become a witness.

(Ex. D3 at 521–22). The court concluded that Ferrier failed to satisfy both prongs of the *Strickland* standard (*id.* at 525).

The trial transcript supports the post-conviction court's factual findings with respect to the colloquy on Ferrier's decision not to testify.  Prior to a lunch break on the last day of trial, the court asked Attorney Holton if Ferrier intended to testify, and Holton responded he would like additional time to consult with Ferrier and provide Ferrier a recommendation on the issue (Ex. B5 at 344–45).  After the lunch break, the court again inquired as to Ferrier's decision, and Attorney Holton responded that he and Ferrier were still discussing it (Ex. B6 at 349).  The court provided them additional time to confer, and then went back on the record:

> THE COURT:  Again, with regard to the question, Mr. Ferrier, as to whether or not you're going to testify, have you had plenty of time to talk about that with Mr. Holton?

> THE DEFENDANT:  Yes, sir.

> THE COURT:  Like I told you before, if you do testify, what I'm going to tell the jury is that you have become a witness in the case and that they should apply the same rules to consideration of your testimony that they apply to the testimony of the other witnesses.

> If you don't testify, I'm going to tell them the Constitution requires the State to prove its accusations against you and it's not necessary for you to disprove anything, nor are you required to prove your innocence, that it's up to the State to prove your guilt by evidence, and that you exercised a fundamental right by choosing not to be a witness in the case and the jury is not to view this as an admission of guilt or be influenced in any way by your decision and that no juror should ever be concerned that you did or did not take the stand to give testimony in this case.

Again, like I said before, too, there are lots of things that you have to look to your lawyer for in a trial, but the one thing that is—one of the things that is totally your decision is whether or not you testify. The law says you're the captain of the ship when it comes to that decision, and it's up to you.

So, all that being explained to you, have you made the decision now as to whether or not you're going to testify?

THE DEFENDANT:  Yes, sir.

THE COURT:  What is that decision?

THE DEFENDANT:  I'm not going to testify.

THE COURT:  You're not going to testify?

THE DEFENDANT:  No, sir.

THE COURT:  All right, sir.  Any additional questions you have about that?

THE DEFENDANT:  No, sir.

(Ex. B6 at 349–51).

Considering the state court record, Ferrier has not shown that the state court's rejection of this IATC claim was based upon an unreasonable determination of the facts.  And based upon those facts, Ferrier has not demonstrated that the state court unreasonably applied *Strickland* in rejecting Ferrier's claim that Attorney Holton provided erroneous advice regarding the State's ability to use prior convictions to

impeach Ferrier's trial testimony.  Ferrier is not entitled to federal habeas relief on

Claim IV.

> **E.    Claim V:  "Counsel deficiently submitted an erroneous jury instruction 3.6(f) that negated Defendant's sole claim of self-defense in violation of U.S. Const. Amends. V due process and VI right to counsel."**

Ferrier asserts the jury instruction on the justifiable use of deadly force

included the following language:

> An issue in this case is whether the defendant acted in self-defense.  It is a defense to the offense with which Jerome Ferrier is charged if the **injury to the victims** resulted from the justifiable use of deadly force.

(*see* ECF No. 53 at 11) (emphasis added).  Ferrier asserts there was no evidence at

trial that any of the victims in Counts II, III, IV, VI, or VII (officers Shea, Graham,

Cutcliffe, Bethea, and Wilson) were injured, nor did the charging document allege

that any of these victims was injured (*id.*).  Ferrier alleges defense counsel was

ineffective for allowing the "injury to the victim" language in the jury instruction

(*id.* at 10–11).  Ferrier contends the erroneous jury instruction negated his sole

defense of self-defense (*id.* at 11).  He contends if the jury had been properly

instructed, they would have found him not guilty of Counts II, III, IV, VI, and VII

(*id.*).  Ferrier states he presented this IATC claim in the Rule 3.850 proceeding (*see*

*id.* at 10–11).

The State contends Ferrier presented a "similar" claim in Ground XI of his amended Rule 3.850 motion; however, Ferrier failed to present it as a federal claim (ECF No. 74 at 28–29). The State contends the claim is thus unexhausted and procedurally barred (*id.* at 28–29, 84). The State alternatively argues that the claim Ferrier presented in the state courts was adjudicated on the merits, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 84–91).

In Ferrier's reply, he concedes he did not frame this particular IATC in federal terms in state court (*see* ECF No. 78 at 25). But Ferrier argues that the state courts recognized the federal nature of all of his IATC claims and adjudicated them under the *Strickland* standard (*id.*).

The undersigned agrees with Ferrier that he fairly presented the federal nature of Claim V to the state courts. In Ground XI of his amended Rule 3.850 motion, Ferrier claimed that defense counsel was deficient for allowing the self-defense jury instruction, because there was no evidence that five of the victims were injured; and he argued the outcome of trial would have been different if counsel submitted a "correct" instruction (*see* Ex. D3 at 434–46). Granted, Ferrier did not cite any federal source of law in Ground XI, but in the vast majority of IATC claims he

presented, he cited the federal *Strickland* standard.  By repeatedly relying upon *Strickland* in support of his IATC claims, Ferrier alerted the state court to the presence of a federal claim in Ground XI, even though he did not expressly cite *Strickland* in that claim.  The court will thus proceed to determine whether Ferrier has satisfied § 2254(d).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.    Federal Review of State Court Decision

As previously noted, Ferrier presented this IATC claim as Claim XI of his amended Rule 3.850 motion (Ex. D3 at 434–36).  In a written memorandum submitted prior to the post-conviction evidentiary hearing, Ferrier's post-conviction counsel argued that Attorney Holton was deficient for failing to seek elimination of the injury requirement from the self-defense jury instruction with respect to Counts II, III, IV, VI, and VII (Ex. D3 at 512–14).  Counsel argued that under *Alexander v. State*, 121 So. 3d 1185 (Fla. 1st DCA 2013), it was fundamental error to give the standard justifiable use of force instruction where there was no evidence that the defendant inflicted injury on the victim (*see id.*).  Counsel argued no reasonable attorney could argue that he intended to use a jury instruction which contained a

fundamental error, and but for counsel's error, Ferrier's case "likely would have gone the other way" (*id.* at 514).

At the evidentiary hearing, Attorney Holton testified he was unaware that it was fundamental error to give the standard justifiable use of force instruction where there was no evidence that the defendant inflicted injury on the victim (Ex. D4 at 561–63).

The state circuit court made oral findings on the record at the conclusion of the evidentiary hearing (Ex. D4 at 628–32). The court opined there was no reasonable basis to accept Ferrier's claim of self-defense, because no rational person in Ferrier's circumstances would have believed he faced a danger of imminent death or great bodily harm from the officers' approaching his home (*id.* at 630). And the court found that Ferrier's reliance upon *Alexander v. State*, 121 So. 3d 1185 (Fla 1st DCA 2013) was unconvincing, because *Alexander* was decided well after Ferrier's trial (*id.*). The court stated:

> You don't only look to . . . whether or not the representation provided by Mr. Holton was deficient and below the standards that are expected. You also have to make a second determination that but for the lack of proper performance on the part of Mr. Holton, that the Defendant would have been acquitted and that this case would have resulted in a different outcome.
>
> I don't find from reviewing the evidence that I see in the case or what I heard today the outcome would have been any different had Mr.

Holton changed his argument and made all the arguments the Defendant says he should have made.

There's more than enough evidence in this case to sustain a conviction. There's more than enough evidence for this case to have gone to a jury. The jury properly considered it and made a determination that Mr. Ferrier had been found guilty beyond and to the exclusion of every reasonable doubt.

(Ex. D4 at 631).

The circuit court subsequently issued a written order, which included further

findings and expressly cited the *Strickland* standard as the applicable legal standard

(Ex. D3 at 518–25). The court summarized its adjudication of Ferrier's IATC claims

as follows:

. . . the evidence of guilt is overwhelming. Had the Court found any error committed by Mr. Holton, which it does not, there is more than enough evidence to support the finding of the jury. There has been absolutely no showing by the Defendant that anything done, or not done by Mr. Holton, would have changed the outcome of the trial.

In considering all the evidence and the performance of Mr. Holton, the Court finds that the Defendant was properly convicted by the evidence, and he is at best Monday morning quarterbacking. The attorney for the Defendant presented a proper defense, properly investigated the case, and made judgment calls at trial that gave the Defendant a very good chance of winning the case. The fact that the Defendant was convicted is not based upon poor performance by his attorneys, but instead, upon more than adequate evidence for a jury to convict. . . .

Having reviewed at length all of the evidence herein and the law, this Court finds that the Motion of the Defendant is not well taken, and

does not meet the criteria established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1983), and the cases following it on the issue of effective representation of a client. *Not only did he fail to establish and ineffective or insufficient representation by Mr. Holton, he failed the second prong of <u>Strickland</u> by not establishing that the outcome would have been an[y] different had Mr. Holton done everything he complains about.*

(Ex. D3 at 524–25) (emphasis is original).

In Ferrier's initial brief to the First DCA, his post-conviction appellate counsel argued that the circuit court erred in denying Claim XI, because the Fourth DCA's opinion in *Bassallo v. State*, 46 So. 3d 1205 (Fla. 4th DCA 2010) had been decided at the time of Ferrier's trial in 2011 (*see* Ex. D6 at 36–39). The First DCA affirmed the circuit court's decision without written opinion (Ex. D9).

The state court reasonably concluded Ferrier failed to show a reasonable probability the jury would have rendered a different verdict on Counts II, III, IV, VI, or VII if the injury requirement had been eliminated from the self-defense instructions. The following evidence was presented to the jury.[9]

At approximately 9:40 a.m. on the day of the shooting, Ferrier's ex-girlfriend, Ms. Williams, went to the Leon County Sheriff's Office and showed Deputy Richard

---

[9] The trial transcript is part of the state post-conviction record (*see* Ex. D3 at 518; Ex. D4 at 627, 631–32).

Womble (a deputy with 19 years of experience) a photo on her phone of Ferrier with a gun to his head (Ex. B3 at 25–27). The photo was admitted as State's Exhibit 1 (*id.* at 27–28). Because the man in the photo had a gun to his head, Deputy Womble believed that law enforcement had an obligation to check on the man's welfare, which Womble testified was a "normal duty of law enforcement officers" (*id.* at 28–29). Deputy Womble acknowledged he did not know when Ms. Williams received the photo (*id.* at 31). Womble notified his supervisor, Sergeant Graham, that Ferrier had sent Ms. Williams the photo and harassing text messages, and Womble told Graham he believed that officers needed to conduct a "welfare check" of Ferrier (*id.* at 29). Deputy Womble described a "welfare check" as officers attempting to make personal contact with the person and evaluating the person to determine whether he or she needs to be taken into protective custody to prevent self-harm (*id.*).

Deputy Shea, Deputy Wilson, Deputy Bethea, Deputy Simmons, Deputy Cutcliffe, and Sergeant Graham (the deputies' immediate supervisor) responded to Ferrier's residence (Ex. B3 at 30, 34–36, 73). The officers were aware of the photo and that Ferrier may have a firearm (*id.* at 30, 39). Deputy Womble became aware that after Ms. Williams left the Sheriff's Office, she and Ferrier communicated, and he communicated this fact to the officers on the scene (*id.* at 32, 39). The officers positioned themselves "out in the open" in front of Ferrier's residence (*id.* at 40, 74).

The officers were informed that a vehicle in front of the residence was Ferrier's (*id.* at 41). Officers knocked on the front door, the windows, and the back door of Ferrier's residence (Ex. B3 at 42–43, Ex. B4 at 195–96). As they knocked, they called Ferrier's name, let him know they were from the Sheriff's Office, and told him they were there to check on his welfare and make sure he was okay and unharmed (Ex. B3 at 43). The officers told Ferrier that if he "verbalized" with them, they would leave (*id.* at 43). The officers even yelled this information through an open window of Ferrier's residence (Ex. B3 at 47, Ex, B4 at 195). Ferrier never provided any verbal or nonverbal response to the officers (Ex. B3 at 44). This continued for at least 30 minutes (Ex. B3 at 44–45, Ex. B4 at 195).

At that time, Lieutenant Blackburn arrived at the scene (Ex. B3 at 44). Ferrier's landlord eventually arrived (*id.* at 44). She provided the officers with keys to Ferrier's residence and she drew a picture of the layout of the residence (*id.* at 44–45).

After the officers had been outside Ferrier's residence for 30–60 minutes, the decision was made to enter the residence to determine if Ferrier was alive (Ex. B3 at 45–46). Because Ferrier was armed, and the officers did not know "what was waiting" for them on the other side of the door, they decided to employ a "breach and hold" tactic, meaning they would open the door but not rush in and instead

maintain their positions outside the residence (*id.* at 47–48).  Prior to opening the door, the officers made a final announcement, notifying Ferrier that they were going to enter the residence and asking Ferrier to respond (*id.* at 49).  Ferrier did not respond (*id.*).  The officers had surrounded the residence, and Lieutenant Blackburn was standing in the yard (*id.* at 49–50).  Deputy Shea inserted the key into the deadbolt of the front door and turned it, but it felt unlocked, so Shea removed the key and tossed it behind him (*id.* at 51).  Deputy Shea pushed the door open with his hand, and continuous gunfire immediately came out the front door from inside (*id.* at 53–54).  All of the officers retreated for cover (*id.* at 54).  While officers were retreating, they were again "out in the open" (*id.* at 82–83).

Lieutenant Blackburn was located behind a tree, and as he looked around the tree, he received gunfire through a window from inside the residence (Ex. B3 at 121).  Blackburn saw bark flying off the tree and felt "glass shrapnel" from the window hit his hand (*id.* at 121–22).  Lieutenant Blackburn realized he had been shot in the shoulder (*id.* at 122).  Deputy Cutcliffe heard Lieutenant Blackburn say he had been shot, and Cutcliffe left his position and ran to Blackburn (*id.* at 164).  Deputy Cutcliffe saw an entry wound on the front of Blackburn's chest and an exit wound in his back (*id.* at 164–65).  Deputy Cutcliffe held Lieutenant Blackburn "down low" so Blackburn had cover, but Cutcliffe had "minimal" cover (*id.* at 165).  Deputy

Cutcliffe believed he was going to be killed, because Ferrier had his hand outside the door and was shooting at him and Blackburn (*id.* at 165–66). Deputy Cutcliffe shot at Ferrier with one hand while he applied pressure to Blackburn's wound with the other hand (*id.* at 166).

During this time, Deputy Shea and Sergeant Graham also saw gunfire come out the window from inside the residence, and officers returned fire (Ex. B3 at 54–55, 83). Deputy Shea realized that he and Deputy Simmons were "in a crossfire," meaning, they were in each other's line of fire, so Shea and Simmons moved to Sergeant Graham's location (*id.* at 55–56). When the officers moved, more gunfire came from inside the residence, and the officers returned fire (*id.* at 56).

Sergeant Graham directed Deputy Bethea and Deputy Simmons to get a patrol car, and he directed Deputy Shea to get his patrol rifle (Ex. B3 at 57–58, Ex. B4 at 197–98). As the deputies were crossing the street, Deputy Bethea saw a hand with a gun come out of a window of the residence, and Ferrier began shooting at the deputies (Ex. B4 at 198–200). Deputy Shea retrieved an AR-15 from his car, but he never fired it (Ex. B3 at 57–58, 64-65). As Deputy Shea was returning to Sergeant Graham's location, he heard glass breaking (Ex. B3 at 59). Deputy Shea saw Ferrier punching out a window and then hanging out of the window (*id.*). Ferrier fired his

handgun at Deputy Shea (Ex. B3 at 59).  A bullet from another officer's gun struck Deputy Shea's taser holster and lodged in his duty belt (*id.* at 60–61).

Deputy Wilson saw Ferrier shoot at the other officers (Ex. B4 at 176).  Wilson immediately shot at Ferrier and then changed his position to behind a car (*id.* at 176–77).  Deputy Wilson saw shots fired from the front door of the residence in his direction, and Wilson fired three shots at the front door (*id.* at 177, 181).

Officers from the Tallahassee Police Department arrived to extract Lieutenant Blackburn (*id.* at 62–63).  As the officers were extracting Lieutenant Blackburn from the yard to the TPD vehicle, Deputy Shea saw Ferrier shooting out the front door of the residence at the vehicle (*id.* at 63–64).  Sergeant Graham was positioned behind a tree, and he saw Ferrier approach the front door, extend his arm, and fire shots at him (Graham) and officers who had relocated behind a patrol vehicle (*id.* at 108–10).  Sergeant Graham fired two rounds through a window of the residence, and saw Ferrier fall to the floor (*id.* at 110).  Deputy Shea saw Ferrier "go down" in the doorway of the living room, and also saw "a lot of blood" (*id.* at 64–65).  No more shots were fired (*id.*).  The officers saw Ferrier's firearm laying just outside, on the front step of the doorway (*id.*).  Ferrier's firearm was still "in his proximity" (*id.*).  For 5–10 minutes, the officers verbally commanded Ferrier to surrender (*id.* at 66).  Ferrier's only response was to kick the front door closed (*id.* at 64–66).

The officers were unsure whether Ferrier had additional firearms, so Lieutenant Graham summoned the SWAT team (Ex. B3 at 66–67).  The SWAT team arrived in an armored vehicle and extracted the officers from the scene (*id.*).  Sergeant Graham testified that approximately 30–45 minutes elapsed between the time the shooting started and the time the SWAT team arrived (*id.* at 106).  Deputy Shea was a member of the Sheriff's Office SWAT team, but because he was involved in the incident, the SWAT team leader assigned Shea to assist at the "command center" set up nearby (*id.* at 67–68).

David Farcas was a member of the SWAT team (Ex. B4 at 209).  Farcas testified he was part of the "entry team" (*id.* at 210).  Farcas testified the team used a "bomb robot" to retrieve Ferrier's handgun near the front door (*id.* at 211, 213).  Farcas testified the entry team then entered the front door, secured the residence, secured Ferrier, and transported him to the hospital (*id.* at 214).  Farcas testified the handgun was turned over to William Punausuia, a property technician with the Sheriff's Office Crime Scene Unit (*id.* at 212, 216).

Keifondra McClure, Ferrier's next door neighbor, corroborated the officers' testimony that for approximately 45 minutes prior to the officers' opening Ferrier's door, the officers announced themselves as law enforcement officers and constantly told Ferrier to come outside (Ex. B4 at 135–36, 138).  Ms. McClure also heard the

officers tell Ferrier, immediately before they opened the door, that if he did not come out, they would come in (*id.* at 139).

William Punausuia testified he examined the 9mm handgun retrieved from Ferrier's front door (Ex. B4 at 217–18, 227).  Punausuia testified the handgun was jammed, because two rounds were attempted to be loaded at the same time (*id.* at 218–19).  Punausuia testified the slide was back, and there was one live round in the chamber and a second live round that was part of the "jam" (*id.*).  Punausuia testified he located an additional five rounds in the magazine (*id.* at 219–20, 225).  Punausuia testified there was "a whole lot" of blood on the 9mm handgun (*id.* at 228).  Punausuia testified that with respect to all of the guns that were at the scene, including Ferrier's and the officers', the gun ejects a cartridge or shell casing each time it is fired (*id.* at 227–28).

Pat McCleod, a detective with the Sheriff's Office Crime Scene Unit, testified he found shell casings from three calibers of ammunition at the crime scene:  .45 caliber casings from the Glock automatic pistols used by law enforcement, .223 caliber casings from the rifles used by law enforcement, and 9mm caliber casings from the Luger pistol used by Ferrier (Ex. B5 at 248–50).  McCleod testified the majority of the 9mm casings and projectiles were recovered either inside Ferrier's residence and just outside the two entrances to the residence (i.e., the main entrance

and the back/kitchen entrance) (*id.* at 248–49).  Detective McCleod testified he recovered four 9mm shell casings inside Ferrier's residence and ten 9mm casings outside Ferrier's residence (*id.* at 256–59, 262–67, 293).  McCleod testified he recovered two 9mm projectiles/bullets outside Ferrier's residence, one on the pavement near a blue Lincoln Town Car, and the other in the dirt near the car (*id.* at 259–61).  McCleod testified he recovered thirty-five live 9mm rounds inside Ferrier's residence (*id.* at 267–73).

With respect to shell casings and projectiles from law enforcement weapons (i.e., the .45 caliber pistols and .223 caliber rifles), Detective McCleod testified he recovered 80–90 casings and projectiles/bullets from the scene (Ex. B5 at 280). McCleod testified all of the casings were located outside Ferrier's residence, indicating that officers were outside the residence when they fired (*id.* at 280–81, 296).  McLeod testified he located all but one of the law enforcement projectiles/bullets inside the residence (*id.* at 294–96).

During closing arguments, the prosecutor spent the great majority of both his first and last closing arguments trying to convince the jury that the evidence satisfied all of the elements of the crimes charged beyond a reasonable doubt (*id.* at 429–48, 477–88).  The prosecutor mentioned Ferrier's self-defense only in his last closing argument, and even then, the prosecutor did **not** argue that the defense was

inapplicable because none of those victims were injured; instead, the prosecutor argued **only** that Ferrier was not defending himself and instead was the aggressor:

> But also keep in mind that Mr. Ferrier—and I will say this, one thing I do agree. This kind of does involve self-defense. The difference is it involves self-defense by the law enforcement officers because Mr. Ferrier is the one that started using this force.

> The self-defense claim says that he can meet force with force. If you're going to assume his argument, where is the force that Mr. Ferrier is returning? Officers didn't shoot into the house first and foremost. They opened a door. Meeting force with force would mean that Mr. Ferrier closed the door. But that's not what he did. He shot at them. He has the right to meet force with force. He exceeded that right, if you're even going to buy into this self-defense claim, because he didn't meet with force. He met force with excessive force.

> Another issue that comes to mind when it comes to this self-defense, it was argued that he can meet force with force and a man's home is his castle. The Castle Doctrine, I think we've all heard, talks about the fact that when somebody is in their home they can defend their home at all cost, that it's reasonable for them to assume that they are going to face imminent death or great bodily harm.

> However, the self-defense jury instruction that you have in front of you says, "A presumption of reasonable fear of imminent death or great bodily harm does not apply if the person against whom the defensive force is used is a law enforcement officer."

> It goes on to say that, as long as the law enforcement officer identifies himself as a law enforcement officer and is doing his duties, that you can't shoot at them. That makes sense. Law enforcement officers have to do their duty. Does that give Mr. Ferrier a right to sit in his house and shoot at them when they're trying to do their lawful duty, simply because he doesn't want to come out, if you're going to

buy into the argument?  Absolutely not.  That's absurd.  That's not self-
defense.  It is certainly not what that is intended to be for.

(Ex. B6 at 479–80).[10]

Considering the trial evidence and the closing arguments, a reasonable jurist

could conclude that Ferrier failed to demonstrate he was prejudiced as a result of

Attorney Holton's failure to request omission of the "injury to the victim" reference

from the self-defense jury instruction.  Indeed, there is no reasonable probability the

_____

[10] The fact that the prosecutor did not mention injury during his closing argument
distinguishes Ferrier's case from the Florida state cases which had been decided at the time of
Ferrier's trial in 2011, in which the courts found fundamental error with respect to the inclusion of
the "injury" language in the self-defense instruction.  In both *Brown v. State*, 59 So. 3d 1217 (Fla.
4th DCA 2011) and *Bassallo v. State*, 46 So. 3d 1205 (Fla. 4th DCA 2010), the error in the jury
instruction was deemed fundamental because self-defense was the defendant's sole defense **and
the prosecutor argued to the jury that the self-defense instruction did not apply because no
injury occurred to the victim**.  *See Brown*, 59 So. 3d at 1219 and *Bassallo*, 46 So. 3d at 1211.

Indeed, the Fourth DCA recognized this distinction in *Neal v. State*, 169 So. 3d 158 (Fla.
4th DCA 2015), which is factually similar to Ferrier's case.  In *Neal*, the Fourth DCA held that no
fundamental error occurred in giving the standard self-defense jury instruction, including the
"injury" language, at a trial on charges which included battery on a law enforcement officer,
because the State presented evidence that one of the two victims was injured, and the prosecutor
did not argue during closing argument that there was no injury to the victims so as to negate the
defendant's claim of self-defense. 169 So. 3d at 160–61.

Additionally, in the First DCA decision relied upon by Ferrier in the state court
proceedings, *Alexander v. State*, 121 So. 3d 1185 (Fla 1st DCA 2013), the First DCA determined
that the trial court's failure to eliminate the injury requirement from the self-defense instruction
was error, but the First DCA did **not** determine that the error was fundamental.  Rather, the First
DCA determined that a **different** error in the self-defense instruction was fundamental,
specifically, the language stating that the defendant was required to prove beyond a reasonable
doubt that the victim committed aggravated battery immediately before the defendant shot the gun,
or the victim would have committed aggravated battery but for the shot. 121 So. 3d at 1188–89.

jury would have accepted Ferrier's self-defense theory if the jury instruction had omitted the reference.  As the state court reasonably concluded, Ferrier's self-defense was weak—no reasonably cautious and prudent person under Ferrier's circumstances could have believed that shooting at the officers was the only way of avoiding the danger of imminent death or great bodily harm to himself. Furthermore, the prosecutor did not compound the error in his closing argument by arguing that the "injury to the victim" language precluded Ferrier from asserting the self-defense defense.

Ferrier has failed to demonstrate that the state court's adjudication of Claim V was based upon an unreasonable determination of fact, or that is was contrary to or an unreasonable application of *Strickland*.  Therefore, Ferrier is not entitled to federal habeas relief on Claim V.

> **F.    Claim VI:  "Counsel failed to file a more adequate motion for new trial for Counts I, II, III, IV, VI, VII in violation of U.S. Const. Amends V due process and VI right to counsel."**

Ferrier contends defense counsel was ineffective for failing to argue, in counsel's motion for new trial, that the physical evidence did not support the convictions, and the testimony of the State's witnesses was not credible; therefore, the trial court should reweigh the evidence and reevaluate the credibility of the testimony (*see* ECF No. 53 at 12–15).  Ferrier contends if counsel had included this

argument in the motion for new trial, the trial court would have "vetoed" the convictions (*id.*).

The State concedes Ferrier's claim is "arguably exhausted, albeit marginally" (ECF No. 74 at 30).  The State argues the state courts adjudicated the merits of the claim, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 92–95). Therefore, Ferrier is not entitled to federal habeas relief (*id.*).

   1. Clearly Established Federal Law

The *Strickland* standard governs this claim.

   2. Federal Review of State Court Decision

Ferrier presented this IATC claim as Ground XV of his amended Rule 3.850 motion (Ex. D3 at 446–50).  At the evidentiary hearing, Attorney Holton testified that only under very limited circumstances would a trial court grant a motion for new trial on the grounds that the verdict was contrary to the law or the weight of the evidence (Ex. D4 at 563).  Holton testified that the trial court would grant such a motion only "where the judge believed that the evidence was not sufficient regardless of the verdict" (*id.*).  Attorney Holton testified he did not include that argument in his motion for new trial, because did not believe there was a reasonable

chance the trial court would find that the jury's verdicts were contrary to the weight of the evidence presented at trial (*id.* at 583–84).

 As previously discussed in rejecting Ferrier's IATC claims, the circuit court determined, at the conclusion of the evidentiary hearing:

> I don't find from reviewing the evidence that I see in the case or what I heard today the outcome would have been any different had Mr. Holton changed his argument and made all the arguments the Defendant says he should have made.
>
> There's more than enough evidence in this case to sustain a conviction.  There's more than enough evidence for this case to have gone to a jury.  The jury properly considered it and made a determination that Mr. Ferrier had been found guilty beyond and to the exclusion of every reasonable doubt.

(Ex. D4 at 631).  And in the circuit court's written decision, the court opined that the evidence of guilt was "overwhelming," and "there is more than enough evidence to support the finding of the jury" (Ex. D3 at 524).  The court determined that Ferrier made "absolutely no showing . . . that anything done, or not done by Mr. Holton, would have changed the outcome of the trial" (*id.*).  The court concluded Ferrier failed to establish either prong of the *Strickland* standard (*id.* at 525).

Ferrier presented this IATC claim in his post-conviction brief to the First DCA (Ex. D6 at 39–45).  The First DCA affirmed the circuit court's decision (Ex. D9).

Rule 3.600(a) of the Florida Rules of Criminal Procedure provides, "[t]he court shall grant a new trial only if . . . the verdict is contrary to law or the weight of the evidence . . . ." Fla. R. Crim. P. 3.600(a)(2).  A trial court properly denies a motion for new trial where there is an "abundance of evidence" to support the jury's verdict.  *See Bryan v. State*, 533 So. 2d 744, 750 (Fla. 1988) (upholding denial of a motion for new trial because there was an "abundance of evidence" regarding the identity of the victim and that the defendant accompanied the victim to the location where he was murdered).

Here, the state court rejected Ferrier's IATC claim because there was "overwhelming" evidence of his guilt.  This determination is well supported by the trial transcript.  Considering the evidence presented at trial, the state court reasonably determined that Attorney Holton was not deficient for failing to argue that the jury's verdict on any Count was contrary to the weight of the evidence.  And the state court reasonably concluded Ferrier was not prejudiced by Holton's failure to make this argument, because there was no reasonable probability the trial court would have granted the motion for new trial if Holton had argued that the verdict was contrary to the evidence.  For these reasons, Ferrier is not entitled to federal habeas relief on Ground VI.

### G.   Claim VII:  "Counsel failed to object to physical leg restraint and failed to request a court record for why the restraint was necessary in violation of U.S. Const. Amend right to counsel and to confront witnesses, *Illinois vs. Allen*, 397 U.S. 337 (1970)."

Ferrier contends Attorney Holton was ineffective for failing to object to the leg restraint applied to Ferrier's right leg during trial as unnecessary (*see* ECF No. 53 at 16–17).  Ferrier asserts the restraint was unnecessary, because he appeared in court five (5) times prior to trial without any disruptions or security issues, and he had no prior convictions for violent acts (*id.*).  Ferrier additionally asserts the leg restraint prevented him from adequately participating in his defense (*id.*).  He asserts the restraint distracted and confused him when it "locked up" numerous times during trial (*id.*).  Ferrier further asserts he did not want to walk in front of the jury wearing the restraint (*id.*).  Ferrier contends if Attorney Holton had objected to use of the leg restraint, the outcome of trial would have been different (*id.*).

The State concedes Ferrier's claim "appears" to be exhausted (ECF No. 74 at 31).  The State argues the state courts adjudicated the merits of the claim, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 95–100).

####    1.   Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.    Federal Review of State Court Decision

Ferrier presented this IATC claim as Ground VII of his amended Rule 3.850 motion (Ex. D3 at 424–26).  At the post-conviction evidentiary hearing, Attorney Holton testified that all of the counsel tables in the courtrooms had a front panel which blocked the jury's view of underneath the table (Ex. D4 at 547).  Attorney Holton testified the leg restraint used in Ferrier's case, known as a "Bundy brace," was worn under the clothing, so the jury was never able to see it (*id.* at 563, 566).  Holton testified he did not notice or become aware of anything that created any type of concern about the Bundy brace (*id.* at 566–68).  Attorney Holton testified if Ferrier had needed to walk in front of the jury, he (Holton) would have requested that the leg restraint be removed, even though the brace permits the wearer to walk and only "locks up" when the wearer attempts to run (*id.* at 566–67).

Ferrier testified at the evidentiary hearing.  He testified the leg restraint "kept locking upon on me, and it really messed my mind up" (Ex. D4 at 603).  Ferrier testified he did not want to walk in front of the jury with the leg restraint on, and he did not want to testify "because of the leg restraint" (*id.*).  But when Ferrier's post-conviction counsel asked him if he would have testified if the leg restraint was off, Ferrier responded, "I really can't say at this moment" (*id.*).

As previously noted, the circuit court found that the testimony of Attorney Holton, Officer Alvin Roberts, and Assistant State Attorney Jon Fuchs was "much more credible" than Ferrier's (Ex. D4 at 626). With respect to this particular IATC claim, the court found as follows:

> I have tried cases and been involved in cases where the Bundy brace was used. I have had defendants testify while wearing the Bundy brace, and they had absolutely no problem getting from the counsel table to the witness stand, so I don't think that that is a valid consideration.

(Ex. D4 at 626). And with respect to all of Ferrier's IATC claims, the court stated on the record that Ferrier failed to show a reasonable probability the outcome of trial would have been any different but for the alleged errors by Attorney Holton (*id.* at 631).

In the circuit court's subsequent written decision, the court addressed the claim as follows:

> Mr. Holton stated that the Defendant was wearing the "Bundy" brace at trial. He did not object. This brace is used by the Bailiffs in numerous cases for security purposes. Mr. Holton stated it was worn under the Defendant's clothing, under counsel table and the jury did not see it. He stated that he kept watching the jury to see if they noticed it, and they did not. . . . [T]his is not a valid issue.

(Ex. D3 at 521). The court determined that Ferrier made "absolutely no showing . . . that anything done, or not done by Mr. Holton, would have changed the outcome

of the trial" (*id.* at 524).  The court concluded Ferrier failed to establish either prong

of the *Strickland* standard (*id.* at 525).

Ferrier presented this IATC claim in his post-conviction brief to the First DCA

(Ex. D6 at 18–21).  The First DCA affirmed the circuit court's decision (Ex. D9).

The routine use of restraints such as shackles **visible to the jury** is

objectionable as a due process violation.  *See Deck v. Missouri*, 544 U.S. 622, 25 S.

Ct. 2007, 161 L. Ed. 2d 953 (2005) (emphasis added); *see also Illinois v. Allen*, 397

U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (trying a shackled defendant

"arouses a feeling that no person should be tried while shackled and gagged except

as a last resort"); *Bryant v. State*, 785 So. 2d 422, 428 (Fla. 2001) (visible shackling

is inherently prejudicial to a defendant).  The Supreme Court has not decided

whether the use of restraints that are **not** visible to the jury is constrained by the

Constitution.  *See Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1307

(11th Cir. 2019).  But the Eleventh Circuit has recognized that non-visible restraints

may burden a defendant's right to a fair trial.  *See United States v. Durham*, 287 F.3d

1297, 1304 (11th Cir. 2002) (citing *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223

(11th Cir. 1983)).  A decision to apply leg shackles must be supported by an essential

state interest and consideration of whether less restrictive methods of restraint could

be employed.  *See Durham*, 287 F.3d at 1304 (citations omitted).

Here, Ferrier did not present the state court with any facts suggesting that the restraint on his leg was visible to any juror at any point in the trial proceedings. Attorney Holton testified the leg restraint was **not** visible, and the state court reasonably accepted this testimony as credible.

Additionally, although Ferrier alleges the leg restraint distracted and confused him during trial, he did not offer any testimony regarding this during the post-conviction evidentiary hearing, nor did he testify that the restraint presented any limitation on his ability to confer with Attorney Holton. And although Ferrier asserts the leg restraint inhibited the exercise of his right to testify in his own defense, Ferrier did not present the state court with any evidence that he alerted either Attorney Holton or the trial court of a concern about the Bundy brace, or that the brace influenced his decision regarding whether to testify. Indeed, at the post-conviction evidentiary hearing, Ferrier did not unequivocally state he would have testified had it not been for the Bundy brace; instead, he stated he "really can't say at this moment" whether or not he would have testified. Moreover, the trial transcript demonstrates that when the trial court questioned Ferrier about whether he wished to testify, Ferrier did not express any concern about the Bundy brace (*see* Ex. B6 at 349–51). And Attorney Holton credibly testified that if Ferrier had decided to testify on his own behalf, Holton would have requested removal of the Bundy brace.

Last, Ferrier's charged offenses included violent criminal conduct, specifically attempting to kill multiple law enforcement officers.

Ferrier has not demonstrated that the state court unreasonably applied *Strickland* in rejecting his claim that Attorney Holton was ineffective for failing to object to the use of a Bundy brace during trial. *See, e.g., Wrinkles v. Buss*, 537 F.3d 804, 823 (7th Cir. 2008) (habeas petitioner failed to demonstrate prejudice from counsel's failure to challenge use of stun belt, where petitioner failed to present any evidence demonstrating the jury saw the stun belt, or that the stun belt affected his abilities to properly participate in his own defense); *see also, e.g., Martin v. Sec'y, DOC*, 347 F. App'x 485, 494–95 (11th Cir. 2009) (unpublished but recognized as persuasive authority) (state court did not clearly err in finding that defendant was not prejudiced by defense counsel's alleged ineffective assistance in failing to object to fact that defendant, who was charged with battery on law enforcement officer, was required to wear stun belt under his clothing, and did not reach a decision that was "contrary to" or involved "unreasonable application of" clearly established federal law in denying ineffective assistance of counsel claim that was predicated on attorney's failure to object to use of stun belt; although defendant testified at hearing on his motion for post-conviction relief that the belt affected his decision not to testify and impeded his ability to communicate with counsel, he later acknowledged

he decided not to testify to avoid having the jury learn of his extensive prior criminal history; further, defense counsel testified that defendant communicated regularly with him throughout trial and would often offer suggestions; additionally, there was no evidence the belt was visible to jury); *Knight v. McDonough*, No. 4:05cv198/MMP/MD, 2007 WL 1051756, at *2 (N.D. Fla. Mar. 29, 2007). Ferrier is not entitled to federal habeas relief on Claim VII.

**H.    Claim VIII:  "Counsel failed to move for judgment of acquittal based on insufficient evidence Counts I, II, III, IV, VI, VII."**

Ferrier contends Attorney Holton was ineffective for failing to move for a JOA on Counts I, II, III, IV, VI, and VII, on the ground that the evidence was insufficient as to the intent element (*see* ECF No. 53 at 18–27). Ferrier contends if counsel had moved for a JOA on these counts, the court would have granted the motion and allowed only lesser included charges to go to the jury (*id.* at 27).

The State concedes Ferrier's claim "appears" to be exhausted (ECF No. 74 at 31–32). The State argues the state courts adjudicated the merits of the claim, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 100–08).

1.    Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.   Federal Review of State Court Decision

Ferrier presented this IATC claim as Ground V of his amended Rule 3.850 motion (Ex. D3 at 404–16).

The trial transcript demonstrates that Attorney Holton made a bifurcated motion for JOA.  Holton first argued Ferrier was entitled to a JOA on Counts V, VIII, IX, and X (Ex. B5 at 319–38).  Holton then argued Ferrier was entitled to a JOA on all Counts under Florida's "Stand Your Ground" law, because the officers were not engaged in the performance of their official duties at the time they attempted to enter Ferrier's residence (*id.* at 339–44).  The trial court granted the motion for JOA as to Counts V, IX, and X as charged (attempted first degree murder) but ruled that the Counts would go to the jury on the lesser included offenses (*id.* at 333–39).  The Court denied the motion for JOA with respect to the remaining Counts (*id.* at 333–34, 344).

At the post-conviction evidentiary hearing, Ferrier's post-conviction counsel questioned Attorney Holton as to why he did not move for JOA on the ground that the evidence supported a reasonable hypothesis of innocence, specifically, that Ferrier intended only to scare the officers when he discharged the firearm (*see* Ex.

D4 at 560–61).  Attorney Holton responded that there was no testimony or evidence

that Ferrier was firing to scare the officers, as follows:

> Q.  In this particular case, as for the judgment of acquittal, was there evidence in the record that would show the Defendant was shooting in the air or shooting to scare as opposed to an attempt to kill?

> A.  Was there evidence?  That's really kind of hard to . . . respond to.  If he would have been shooting in the air, then I don't know, absent a bullet buzzing by somebody's—close enough that they could literally hear it traveling past them, there would be no way for them to make a determination as to that.

> So there was testimony about a shot hitting the bark on a tree. There was some questions about shots actually hitting a vehicle, I believe it was Mr. Ferrier's vehicle, which was parked in front of the apartment.  And there may have been other testimony about a shot hitting the pavement.  But as to is there affirmative testimony that shows that he was firing in the air to scare them?  I don't recall there being such testimony or evidence.

> Q.  All right.  And was there evidence that was put in that would indicate that—that would rebut such a claim?

> A.  Well, let's just take the opening situation, a knock on the front door and bullets through the front door.  That would—I think the reasonable conclusion you can draw from that is that he was attempting to shoot the person who was on the other side of the door.

> Q.  And was there also evidence of the—of officers taking cover and the cover they were behind was, in fact, getting hit?

> A.  There was testimony that officers believed that shots were being fired at them, and that was based upon literally that shots were hitting near them, yes, sir.

Q.  And that involved multiple officers and multiple occasions; is that correct?

A.  More than one. I can't sit here and say three out of eight or whatever; but, yeah, there were multiple officers who testified that there was occurrences that made them believe that a projectile was headed— had been shot in their direction.  And I shouldn't even say direction.  I should say at them because it was close enough that they heard it, or it made contact with an object hey were close to or related to.

Q.  Okay.  Now, was there any basis on the record that or the evidence presented at trial that a court would be legally required to grant a judgment of acquittal on had you raised the issue that he was attempting to scare, and the State hasn't rebutted that argument, was there evidence sufficient to go to the jury on that fact?

A.  I believe there was more than sufficient evidence to take that question to the jury, but that's really a two-part issue there.  Even if I in my opinion determined that I thought, yeah, this is going to go to the jury no matter whether the—the evidence as it is, I would make an argument if I felt that there was any evidence to support it, because you have got to preserve those issues.  And I didn't feel that there was evidence sufficient to make that argument.

. . . .

Well, there was, my recollection, you know, knocks on the door, and boom, boom, however many, two or three shots go through the door.

They retreat down the steps and go under a window, which is, if you're looking at the front of the residence, there is a window to the left, and as they are headed in that direction, shots come out of that window.  So to me that was a fairly good indication that it wasn't just shooting to get them to leave but was shooting at them.

. . . .

And then there was . . . even another window that he went to and testimony was extended his arm out the window and fired the gun.

(Ex. D4 at 575–78).

At the conclusion of the evidentiary hearing, the court determined:

> I don't find from reviewing the evidence that I see in the case or what I heard today the outcome would have been any different had Mr. Holton changed his argument and made all the arguments the Defendant says he should have made.

> There's more than enough evidence in this case to sustain a conviction. There's more than enough evidence for this case to have gone to a jury. The jury properly considered it and made a determination that Mr. Ferrier had been found guilty beyond and to the exclusion of every reasonable doubt.

(Ex. D4 at 631).

In the court's subsequent written order, the court added the following findings

and conclusions:

> Mr. Holton presented a defense that the Defendant was not trying to kill anyone. He argued quite eloquently that the police had no right to invade the property of the Defendant; that they made the decision to come in when he would not come out, thereby triggering the chaos; that the Defendant was simply trying to defend himself, his home and castle from an improper encroachment by police. This and justifiable use of force, plus lack of any intent to kill, was presented to the jury as a valid jury question. Unfortunately for the Defendant, the evidence to the contrary was overwhelming. Mr. Holton raised the same issues in his Motion for Judgment of Acquittal, as well as in an extensive Motion for New Trial. His argument properly addressed all counts. In fact, he was successful in getting the Judge to JOA two of the Attempted First Degree Murder Counts. The Court does not find from the record that his argument was deficient in any manner. Mr. Holton stated that he believed there was sufficient evidence for the case to go to a jury, as does this Court. So apparently did the First District Court of Appeal,

as all of the Defendants convictions were affirmed, except for Counts 9 and 10.  These were remanded for a new trial, and were ultimately dismissed by the State.

. . . .

Finally, Mr. Holton said he did not believe there was insufficient evidence for the case to be presented to a jury.  This Court finds that there was no reason presented to establish that this matter should not have been submitted to a jury.  Further, the evidence of guilt is overwhelming.  Had the Court found any error committed by Mr. Holton, which it does not, there is more than enough evidence to support the finding of the jury.  There has been absolutely no showing by the Defendant that anything done, or not done by Mr. Holton, would have changed the outcome of the trial.

In considering all the evidence and the performance of Mr. Holton, the, Court finds that the Defendant was properly convicted by the evidence, and he is at best Monday morning quarterbacking.  The attorney for the Defendant presented a proper defense, properly investigated the case, and made judgment calls at trial that gave the Defendant a very good chance of winning the case.  The fact that the Defendant was convicted is not based upon poor performance by his attorneys, but instead, upon more than adequate evidence for a jury to convict.

(Ex. D3 at 522–24).

Ferrier presented this IATC claim in his post-conviction brief to the First DCA

(Ex. D6 at 9–18).  The First DCA affirmed the circuit court's decision (Ex. D9).

There is sufficient evidence to withstand a motion for JOA if, after viewing

the evidence in the light most favorable to the State, a rational trier of fact could find

the existence of the elements of the crime beyond a reasonable doubt.  *See Delgado*

*v. State*, 71 So. 3d 54, 65–66 (Fla. 2011) (internal quotation marks and citation

omitted).  "In moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." *Id.* at 66 (internal quotation marks and citations omitted).  "Under this standard, the State is required to prove each and every element of the offense charged beyond a reasonable doubt, and when the [State] fails to meet this burden, the case should not be submitted to the jury, and a judgment of acquittal should be granted."  *Id.* (internal quotation marks and citations omitted).  However, "[w]here the State has presented competent, substantial evidence of the crimes charged, the trial court does not err in denying a motion for judgment of acquittal and submitting the case to the jury."  *Id.* (internal quotation marks and citation omitted).

Under Florida law, where a conviction was brought about **solely** through circumstantial evidence, the State must meet a stricter burden of proof, that the evidence presented be "inconsistent with any reasonable hypothesis of innocence." *State v. Law*, 559 So. 2d 187, 188 (Fla. 1989).  "The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine." *Id.*  But "if the State presents both direct and circumstantial evidence, courts do not apply the special standard of review applicable to circumstantial evidence cases." *Mosley v. State*, 46 So. 3d 510, 526 (Fla. 2009) (citation omitted).

Applying Florida's JOA standard to the evidence adduced at Ferrier's trial (summarized *supra*), the state court reasonably concluded there was no reasonable probability the trial court would have granted a JOA if Attorney Holton had made the specific argument Ferrier faults him for not making, i.e., that there was insufficient evidence that Ferrier had a premeditated intent to kill the officers.

Ferrier has not demonstrated that the state court's rejection of this IATC claim was based upon an unreasonable determination of fact, or that the court's adjudication was contrary to or an unreasonable application of *Strickland*.  Ferrier is not entitled to federal habeas relief on Claim VIII.

I.    **Claim IX:  "Counsel failed to object to jury instruction omitting a necessary element of first degree attempted murder that the defendant had knowledge it was law enforcement."**

**Claim X:  "A retroactive change in the law affects Ferrier's trial and postconviction proceedings that warrant relief.  Ferrier is being detained in state prison in violation of U.S. Const. Amends. V, VI, and XIV due process of law."**

Ferrier contends Attorney Holton was ineffective for failing to object to the jury instruction on attempted first degree murder of a law enforcement officer on the ground that it failed to instruct the jury that one of the essential elements of the offense was that Ferrier knew that the victim was a law enforcement officer (*see* ECF No. 53 at 28–30).  Ferrier contends if counsel had objected to the jury

instruction, the instruction would have been modified to include the element, and the jury would not have found sufficient evidence proving that Ferrier knew the victims were law enforcement officers (*id.*).  Ferrier contends the Florida Supreme Court's decision in *Ramroop v. State*, 214 So. 3d 657 (Fla. 2017), entitles him to a new trial due to the omission of the knowledge requirement from the jury instruction (*id.* at 29–30).

The State concedes Ferrier's claims "appear" to be exhausted (ECF No. 74 at 32–33).  The State argues the state courts adjudicated the merits of the claims, within the meaning of § 2254(d), and Ferrier has not established that the last state court's adjudication was contrary to or an unreasonable application federal law, or that it was based upon an unreasonable factual determination (*id.* at 109–15).

   1. Clearly Established Federal Law

The *Strickland* standard governs Ferrier's IATC claim.

   2. Federal Review of State Court Decision

Ferrier presented this IATC claim as Ground X of his amended Rule 3.850 motion (Ex. D3 at 432–33).  He argued that although the standard jury instruction at the time of his trial (September of 2011) did not include the "knowledge" element (i.e., that the victim was a law enforcement officer), the Florida Supreme Court had held that it was an element, *see Thompson v. State*, 695 So. 2d 691 (Fla. 1997) (*id.*).

At the post-conviction evidentiary hearing, Attorney Holton testified he was aware that the Florida Supreme Court had held that the defendant's knowledge that the victim was a law enforcement officer was an element of the offense of attempted murder of a law enforcement officer (Ex. D4 at 550). Holton testified that if the Florida Legislature changed the statute upon which the supreme court case was based so that such knowledge was no longer an element, the standard jury instruction would not have included it, and a special instruction would need to be requested *id.* at 550–52, 570–71). Holton acknowledged that the standard jury instruction was given at Ferrier's trial (*id.* at 550–51).

Attorney Holton additionally testified that the issue of Ferrier's knowledge of the victims' status as law enforcement officers was never in dispute:

> [Attorney Holton]. I don't believe it was ever a factual issue. If you're saying did the Defendant relate to me, "I didn't know that was the police," no, that never was the situation. And the testimony in the case as well as the discovery was that law enforcement identified themselves, knocked, and clearly stated who they were.

> Q [by the State]. And I think on direct a moment ago, you—on the question about whether or not he was shooting to scare or not, wasn't some of your testimony that the Defendant told you that he knew who it was, he just didn't think that law enforcement had a right to enter?

> A. That's correct.

Q.    So he—factually, he, in fact, knew they were law enforcement officers?

A.  I believe he knew they were law enforcement officers because that was the reason that he didn't—he did not want law enforcement in his apartment.  He did not believe they had the right to enter.

Q.  Okay.  So the Defendant's knowledge of whether or not these people were law enforcement was never a factual issue at trial; it never was a factual issue with the Defendant saying, "I didn't know who they were"?

A.  That's correct.

Q.  So it was not a contested issue?

A.  No.

Q.  And independent of that, based upon the evidence you heard, there was quite a bit of—quite a bit of evidence in this case that would indicate that a person would have known they were law enforcement?

A.  Let's put it this way, it would have sure been hard to miss that fact.

(Ex. D4 at 571–72).

Ferrier testified at the evidentiary hearing that he told Attorney Holton he was shooting to scare the police away.  Ferrier stated, "I told him that I was in fear of my life, and I was only trying to get the police not to come in my house and kill me." (Ex. D4 at 600–01).

At the conclusion of the evidentiary hearing, Ferrier's post-conviction counsel argued that the Florida Supreme Court's decision in *Thompson v. State*, 695 So. 2d 691 (Fla. 1997) held that a jury instruction on attempted first-degree murder of a law enforcement officer which omits knowledge as an element is erroneous (Ex. D4 at 619).  But Ferrier's counsel acknowledged there were subsequent amendments to the relevant statute (*id.*).

Counsel for the State argued that *Thompson* interpreted a 1993 statute, but the Florida Legislature subsequently amended to statute to remove the knowledge element (Ex. D4 at 624–25).  Counsel argued there was no post-amendment case law stating that knowledge was still an element (*id.* at 625).

Prior to issuance of the circuit court's written decision, Ferrier's post-conviction counsel filed an Amended Motion to Supplement the Record and Defense Memorandum, which provided additional argument on Ground X (Ex. D5 at 651–53).  Ferrier's counsel argued that nine days after the post-conviction evidentiary hearing, the Fifth DCA decided *Ramroop*, which held that knowledge of the victim's status as a law enforcement officer was a substantial element of the crime of attempted first degree murder of a law enforcement officer (*see id.*).  Counsel argued that the remedy for the omission of the knowledge element from the jury instruction was to resentence Ferrier on Counts I, II, III, IV, VI, and VII (*id.*).

The court's written order denying relief included the following findings and

conclusions:

> Mr. Holton stated that the standard jury instructions in effect at the time were given to the jury, and that if the Legislature had removed the issue of knowledge of being a law enforcement officer as an element of the crime from the instructions, he would have known so. He said there was never a fact issue about the individuals being law enforcement. They clearly identified themselves as law enforcement, and were dressed in uniforms. The Defendant simply did not want them in his house or yard. This was never an issue at trial. There was no testimony that the Defendant was firing in the air to scare the officers. Shots were going in every direction towards officers, including several through the door. Shots actually struck items in close proximity to officers. The Defendant never told him he was simply trying to scare the officers. Mr. Holton said that defense would have been a very hard sell.

(Ex. D3 at 523–24). As previously noted, the state circuit court concluded its written

decision by stating:

> Having reviewed at length all of the evidence herein and the law, this Court finds that the Motion of the Defendant is not well taken, and does not meet the criteria established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1983), and the cases following it on the issue of effective representation of a client. *Not only did he fail to establish and ineffective or insufficient representation by Mr. Holton, he failed the second prong of <u>Strickland</u> by not establishing that the outcome would have been an[y] different had Mr. Holton done everything he complains about.*

(Ex. D3 at 525) (emphasis in original).

In Ferrier's post-conviction appellate brief, he argued to the First DCA that the circuit court erred by denying Ground X and failing to resentence him pursuant to *Thompson* and *Ramroop* (Ex. D6 at 33–36).  The First DCA affirmed the circuit court's denial of Ground X (Ex. D9).  Ferrier has not demonstrated that the state court's adjudication of his claims was contrary to or an unreasonable application of clearly established federal law.  It is evident from the Florida Supreme Court's adoption of comments in the 2014 amendments to the standard jury instructions that at the time of Ferrier's trial, no Florida case had decided whether knowledge of the victim's status as a law enforcement officer was an element of the offense of attempted murder of a law enforcement officer:

> Regarding the enhanced penalty under Fla. Stat. § 782.065, the statute does not specify that it is an element of the offense that the defendant knew or had reason to know that the victim was a law enforcement officer, etc.  In *Thompson v. State*, 695 So. 2d 691 (Fla. 1997), the Supreme Court held that knowledge of the victim's status is a necessary element of attempted murder of a law enforcement officer, but that was prior to the enactment of Fla. Stat. § 782.065 and was based on a construction of Fla. Stat. § 784.07, which explicitly contains a knowledge requirement.  As of February 2013, no case has decided whether knowledge of the victim's status is an element under Fla. Stat. § 782.065.

*See* In re Standard Jury Instructions in Criminal Cases—Report No. 2013-02, 137 So. 3d 995, 1000 (Fla. Apr. 24, 2014).  Indeed, the first case to decide the issue was *Ramroop v. State*, 174 So. 3d 584 (Fla. 5th DCA 2015), which was decided four

years after Ferrier's trial.  An attorney's failure to anticipate a change in the law does not constitute ineffective assistance.[11]  *See Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1334 (11th Cir. 2016) (explaining that "we have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop" (alterations accepted)).

Moreover, to the extent Ferrier challenges the state courts' failure to retroactively apply the Fifth DCA's *Ramroop* decision to his case on collateral review, he is not entitled to relief, because '[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (internal quotation marks and citation omitted).  Further, Ferrier has not cited a case from the United States Supreme Court which holds that a state court's failure to retroactively apply another state court's decision violates the Constitution. Therefore, he has not shown that the state courts' failure to retroactively apply

---

[11] Indeed, in a letter to Ferrier from his post-conviction counsel, which Ferrier submitted to the state circuit court and the First DCA, counsel advised Ferrier that Ground X was meritless, because *Thompson* applied only if Ferrier was convicted between July 1, 1993 and July 1, 2005, which he was not (Ex. D3 at 498–505, Ex. D8, Appendix A).

*Ramroop* in his Rule 3.850 proceeding and appeal was contrary to or an unreasonable application of clearly established federal law under § 2254(d).

Ferrier has not demonstrated that the state court's adjudication of Claim IX or Claim X was contrary to or an unreasonable application of clearly established federal law. Therefore, he is not entitled to federal habeas relief on either claim.

**J.     Claim XI: "The Leon County Court improperly imposed filing fees on Petitioner's inmate bank account for postconviction purposes in violation of Const. Amend VIII excess fines imposed and *Burns v. Ohio*, 360 U.S. 252, 257 (1959)."**

Ferrier challenges the state circuit court's imposition of a lien on his inmate back account in the amount of $425.00 for the filing fee in a civil case against the public defender's office seeking an injunction requiring them to release documents to him, Leon County Circuit Court Case No. 2014-CA-1005, and the circuit court's imposition of liens on his account in the amounts of $205.00 and $265.00 for appellate filing fees in First DCA Case Nos. 1D15-0088 and 1D16-0542, respectively (ECF No. 53 at 31–32). Ferrier contends the liens violated the Eighth Amendment's prohibition on excess fines (*id.*).

The State contends that although Ferrier challenged the circuit court's imposition of each of the filing fee liens in the state courts, Ferrier failed to fairly present his challenges as federal in nature (ECF No. 74 at 34–37). The State

contends Ferrier is now procedurally barred from returning to state court to bring federal challenges to the liens; therefore, Claim XI is procedurally defaulted and procedurally barred from federal review (*id.*).

Notwithstanding the exhaustion issue, Ferrier is not entitled to federal habeas relief on Claim XI.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  The state court record demonstrates that the nature of the liens which Ferrier challenges in Claim XI were filing fees and other fees imposed by the state circuit court in relation to Ferrier's mandamus action filed in the Leon County Circuit Court, Case No. 2014-CA-1005, and Ferrier's appeals of the circuit court's orders denying relief, First DCA Case Nos. 1D15-0088 and 1D16-0542 (*see* Exs. I1–I8).

The Eleventh Circuit has repeatedly held that alleged defects in a proceeding collateral to a defendant's conviction and sentence do not state a basis for federal habeas relief.  *See Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–6 (11th Cir. 2010); *see also Carroll v. Sec'y, DOC, Fla. Attorney Gen.*, 574 F.3d 1354, 1365-66 (11th Cir. 2009) ("This Court has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief.") (citing *Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006); *Quince v. Crosby*, 360 F.3d

1259, 1262 (11th Cir. 2004); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987)).

Furthermore, even if the state court erroneously imposed the financial liens, he court' doing so does not demonstrate that Ferrier's **custody** is unconstitutional. *See* 28 U.S.C. § 2254(a).  Ferrier is not entitled to federal habeas relief on Claim XI.

### K.    Claim XII:  "Counsel was ineffective when he committed extrinsic fraud at Petitioner's *Nelson/Faretta* hearing in violation of U.S. Const. Amends VI and V due process."

Ferrier contends Attorney Holton lied to the trial court during a *Nelson/Faretta*[12] hearing on June 10, 2011, when Holton told the court he had reviewed all of the discovery materials he had received from the State Attorney's Office, and had taken the depositions of the officers who were named as victims in the charging document (ECF No. 53 at 33–36).  Ferrier asserts Attorney Holton did not depose Deputy Simmons, Officer Perry, or Officer Davis (the victims in Counts

---

[12] *Nelson v. State*, 274 So. 2d 256, 258–59 (Fla. 4th DCA 1973) (holding that when a defendant seeks to discharge court-appointed counsel before trial on account of ineffectiveness, "the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant.").

*Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (recognizing that a defendant may exercise a right to self-representation by making a knowing and voluntary waiver of the right to counsel).

VIII, IX, and X).  Ferrier also asserts Holton did not review the following discovery materials:  DVDs containing audio recordings of interviews of law enforcement officers/witnesses, DVDs containing audio recordings of interviews of civil witnesses, radio transmissions of the Leon County Sheriff's Office, an audio recording of a statement by witness Keifondra McClure, Detective Pearson's interview of Ferrier, and "CAD notes" (*id.*).

Ferrier contends if the trial court had known that Attorney Holton had not reviewed all of the discovery materials and deposed all of the victim officers, the court would have discharged counsel and appointed new counsel (ECF No. 53 at 33–36).  Ferrier asserts his new counsel would have thoroughly investigated the case, deposed all of the victim officers, examined all of the evidence, and "won Petitioner's trial" (*id.* at 36).

The State contends this claim is procedurally barred (ECF No. 74 at 37–39, 117).  The State asserts Ferrier presented this claim to the state courts as Claim II of his second Rule 3.850 motion.  The State asserts the circuit court denied the claim on firmly established and regularly followed state procedural grounds, and the First DCA affirmed the lower court's procedural ruling (*id.*).  The State contends this federal court must honor the state court's application of its procedural ruling (*id.*).

The state court record demonstrates that Ferrier presented this IATC claim as Claim II of his second Rule 3.850 motion (Ex. E1 at 32–55). The state circuit court ruled that the motion was untimely under Rule 3.850(b) and improperly successive under Rule 3.850(f) (*see id.* at 82–83). The First DCA affirmed the circuit court's decision (Ex. E6).

The state courts' ruling—that Ferrier's claim was untimely and successive under Rule 3.850—constitutes an independent and adequate state law ground for denial that procedurally bars the claims from federal habeas review. The state court clearly and expressly stated it was relying on state procedural rules to resolve the federal claim. Further, the state court's decision on the procedural issue rested entirely on state law grounds and was not intertwined with an interpretation of federal law. Additionally, the rule that a successive Rule 3.850 motion is generally prohibited when the grounds alleged therein could have been known at the time of the first Rule 3.850 motion is firmly established and consistently followed by the Florida courts. *See Baker v. State*, 878 So. 2d 1236, 1243–44 (Fla. 2004); Fla. R. Crim. P. 3.850(h) (formerly Rule 3.850(f)); *Christopher v. State*, 489 So. 2d 22, 24 (Fla. 1986); *Frazier v. State*, 898 So. 2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); *Washington v. State*, 876 So.2d 1233, 1234 (Fla. 5th DCA 2004)

(same); *see also, e.g., Jones v. Crews*, No. 3:13cv630/LAC/EMT, 2014 WL 5364176, at *10 (N.D. Fla. Oct. 21, 2014) (unpublished) (rule prohibiting the filing of successive post-conviction motions is firmly established and regularly followed); *Dubon v. Crews*, No. 3:12cv283/MCR/EMT, 2014 WL 3519015, at * 10 (N. D. Fla. July 16, 2014) (unpublished) (same); *Durkin v. Sec'y, Fla. Dep't of Corr.*, No. 5:11cv365/MMP/CJK, 2013 WL 678332, at *28 (N. D. Fla. Dec. 20, 2013) (unpublished) (same); *Barge v. Crews*, No. 3:11cv612/MW/CJK, 2013 WL 6085128, at *12 (N. D. Fla. Nov.19, 2013) (unpublished) (same); *Harris v. Sec'y, Dep't of Corr.*, No. 3:11cv471/RV/EMT, 2012 WL 5876649, at *7 (N. D. Fla. Nov.5, 2012) (unpublished) (same).

Also firmly established and regularly followed is Florida's rule that a Rule 3.850 generally must be filed within two years from when the judgment and sentence become final. *See Baker*, 878 So. 2d at 1244; *see also* Fla. R. Crim. P. 3.850(b); *see also, e.g., Jones*, 2014 WL 5364176, at *10 (Florida's rule prohibiting the filing of untimely post-conviction motions is firmly established and regularly followed); *Durkin*, 2013 WL 678332, at *28 (same).

Because the state court rejected Ferrier's IATC claim on the independent and adequate state ground of procedural bar or default, this federal court considers the

claim procedurally defaulted for federal habeas purposes. *See Coleman*, 501 U.S. at 734–35 and n.1.

Ferrier relies upon *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse his procedural default (*see* ECF No. 78 at 40–41).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right. *Wainwright v. Sykes*, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray*, 477 U.S. at 488). Before its 2012 decision in *Martinez*, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause. *See Coleman*, 501 U.S. at 752–53. *Martinez* created a limited, equitable exception to *Coleman* where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-

of-trial-counsel claim is a substantial one." *Martinez*, 566 U. S. at 14 (citations

omitted). Accordingly, the petitioner must "establish that his collateral counsel's

conduct 'fell below an objective standard of reasonableness,' and that, 'but for

counsel's unprofessional errors, the result of the proceeding would have been

different.'" *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014)

(quoting *Strickland*, 466 U.S. at 688).

In *Hittson*, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the
> *Strickland* analysis. With unlimited time and the benefit of hindsight,
> a petitioner can come up with any number of potentially meritorious
> ineffective-assistance claims that he now wishes his collateral counsel
> had raised. However, a petitioner does not establish constitutionally
> defective performance simply by showing that (a) potentially
> meritorious claims existed and (b) his collateral counsel failed to raise
> those claims. *Murray*, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere
> fact that counsel failed to recognize the factual or legal basis for a claim,
> or failed to raise the claim despite recognizing it, does not constitute
> cause for a procedural default."). "Experienced advocates since time
> beyond memory have emphasized the importance of winnowing out
> weaker arguments on appeal and focusing on one central issue if
> possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S.
> 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). "[A] per
> se rule that . . . the professional advocate, [is not] allowed to decide
> what issues are to be pressed . . . seriously undermines the ability of
> counsel to present the client's case in accord with counsel's
> professional evaluation." *Id.* at 751, 103 S. Ct. at 3313.
>
> As we have explained, *Strickland* instructs courts to "indulge a
> strong presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance"—that counsel "rendered

adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90, 104 S. Ct. at 2065–66. To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

> Thus, to show that his habeas counsel failed to provide the level of representation required by *Strickland*, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

*Hittson*, 759 F.3d at 1263 (footnote omitted).

The Eleventh Circuit then explained *Martinez*'s "substantial claim" requirement:

> *Martinez* articulated the "substantial claim" requirement as follows:
>
> > To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller–El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> *Martinez*, 566 U.S. at —, 132 S. Ct. at 1318–19. Neither *Martinez* nor *Trevino* [*v. Thaler*, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to *Miller–El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

As the Court explained in *Miller–El*, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." *Miller–El*, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from *Strickland*.

*Hittson*, 759 F.3d at 1269–70 (footnotes omitted).

Here, Ferrier has not stated a substantial IATC claim. At the *Nelson*/*Faretta* hearing on June 10, 2011, Attorney Holton told the court, "I have reviewed all of the

information I received from the State Attorney in discovery and there has been quite

a large amount of discovery provided in this case." (Ex. B10 at 141).  The mere fact

that certain discovery materials (e.g., DVDs containing audio recordings of

interviews of law enforcement officers/witnesses, DVDs containing audio

recordings of interviews of civil witnesses, radio transmissions of the Leon County

Sheriff's Office, an audio recording of a statement by witness Keifondra McClure,

Detective Pearson's interview of Ferrier, and "CAD notes") were not in the

**possession** of Attorney Holton or the Public Defender's Office does not suggest that

Attorney Holton did not review them prior to trial.

> With respect to depositions, Attorney Holton told the trial court:

> As for the depositions, I have taken the depositions of all 11 officers who were listed as named victims in the information.  And as they are transcribed, I make copies and send them to Mr. Ferrier.  If he hasn't received all 11, it's because I haven't received all 11.

(Ex. B10 at 143).  There were actually only 10 officers named as victims in the

charging document (*see* Ex. B1 at 12–14).  Ferrier asserts Attorney Holton did not

depose Deputy Simmons, Officer Davis, or Officer Perry.

> Assuming, purely for argument's sake, that Attorney Holton misspoke when

he stated he had deposed all of the officer victims, Ferrier has not made a substantial

showing that he was prejudiced by this error.  Deputy Simmons, Officer Davis, and

Officer Perry testified at Ferrier's trial.  The trial court granted Attorney Holton's motion for JOA with respect to the charge of which Deputy Simmons was the victim (Count VIII); and the State declined to prosecute the charges of which Officers Davis and Perry were the victims (Counts IX and X) upon remand from the First DCA. Ferrier has not made a substantial showing that there is a reasonable probability the result of his trial would have been different if Attorney Holton had admitted he had not conducted pre-trial depositions of these three officers.

Ferrier has not shown he is entitled to federal review of Claim XII through *Martinez* or any other recognized exception to the procedural bar.  Therefore, he is not entitled to federal habeas relief on Claim XII.

### L.   Claim XIII:  "Counsel was ineffective by advanceing [sic] self-defense at trial, when he should have advanced a suicide by cop defense, in violation of U.S. Const. Amends V due process and IV right to counsel."

Ferrier contends Attorney Holton was ineffective for advancing a self-defense theory instead of a "suicide by cop" theory, i.e., that he shot at the officers to induce them to shoot and kill him (ECF No. 53 at 37–40).  Ferrier asserts if Attorney Holton had advanced the "suicide by cop" theory, the State would have been unable to prove he had a premeditated intent to kill any of the officer victims (*id.*).

The State contends this claim is procedurally barred (ECF No. 74 at 39–40, 117–18).  The State asserts Ferrier presented this claim to the state courts as Claim I of his second Rule 3.850 motion.  The State asserts the circuit court denied the claim on firmly established and regularly followed state procedural grounds, and the First DCA affirmed the lower court's procedural ruling (*id.*).  The State contends this federal court must honor the state court's application of its procedural ruling (*id.*).

The state court record demonstrates that Ferrier presented this IATC claim as Claim I of his second Rule 3.850 motion (Ex. E1 at 38–44).  The state circuit court ruled that the motion was untimely under Rule 3.850(b) and improperly successive under Rule 3.850(f) (*see id.* at 82–83).  The First DCA affirmed the circuit court's decision (Ex. E6).

For the reasons discussed *supra* in Claim XII, the state court's rejection of Ferrier's IATC claim was based upon an independent and adequate state ground of procedural bar or default.  Therefore, this federal court also considers the claim procedurally defaulted.  *See Coleman*, 501 U.S. at 734–35 and n.1.

Ferrier again relies upon *Martinez* to excuse the procedural default (*see* ECF No. 78 at 42–44).  But Ferrier has failed to show that his post-conviction counsel was ineffective for failing to present this IATC claim in the Rule 3.850 proceeding.

In order to grant relief, the state court would have had to conclude that there was a reasonable probability the result of Ferrier's trial would have been different if Attorney Holton had advanced a "suicide by cop" theory.   The officers' testimony regarding the path of Ferrier's bullets, Ferrier's poking only his hand out of a window and shooting in their direction, and his continuing to shoot at the officers for 30–45 minutes when they returned fire, contradicts any suggestion that Ferrier shot at the officers only to induce them to shoot and kill him.  If that had been Ferrier's intent, he would not have offered as much continued resistance as he did. There is simply no reasonable probability the circuit court would have concluded there was a reasonable probability the jury would have rendered different verdicts if Attorney Holton had advanced a "suicide by cop."   Therefore, Ferrier's post-conviction counsel was not ineffective for failing to assert this IATC claim in the first Rule 3.850 proceeding.

Ferrier has not shown he is entitled to federal review of Claim XIII through the "cause and prejudice" exception or any other recognized exception to the procedural bar.  Therefore, habeas relief should be denied on Claim XIII.

**M.    Claims XIV and XV:   "The Leon County Court is without jurisdiction of Petitioner's judgment and sentence, because the State's information failed to inform him of the elements of the crimes and the nature and cause of the accusations, in violations [sic] of U.S. Const. Amends V, XIV due process and VI right to be informed."**

Ferrier contends the trial court lacked jurisdiction to sentence him under Florida Statutes § 782.065, because the State did not cite that statute in the charging document, nor did the State allege that Ferrier knew that any of the victims were law enforcement officers when he shot at them, which is an element of the crime of attempted first degree murder of a law enforcement officer, as recognized in *Ramroop v. State*, 214 So. 3d 657 (Fla. 2017) (ECF No. 53 at 41–43). Ferrier additionally argues the charging document was fundamentally defective with respect to Counts I, II, and III, because the charging document did not "recite the nine different theories, acts, accusations, times, places, and elements" that were described in the officers' trial testimony (*id.* at 44–45).

The State asserts these claims are similar to the claims Ferrier asserted in Issues II and III of his motion to correct illegal sentence filed under Rule 3.800(a) (ECF No. 74 at 40–42). The State contends the claims are unexhausted, because Ferrier waived the issue by failing to object to the alleged defects in the charging document at trial (*id.*). The State alternatively argues the state court's adjudication of the claims in the Rule 3.800 proceeding is entitled to deference (*id.* at 118–22). As a final argument, the State contends that despite Ferrier's couching his claims in

terms of due process, the underlying issues are matters of purely state law, which provides no basis for federal habeas relief (*id.* at 122).

1.      Clearly Established Federal Law

Under the Sixth Amendment, a defendant has a right to reasonable notice of the charge against him. *See In re Oliver*, 333 U.S. 257 (1948) (a defendant's right to reasonable notice of the charge against him is applied to the states through the Fourteenth Amendment). "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 644 (1948); *Markham v. United States*, 160 U.S. 319, 16 S. Ct. 288, 40 L. Ed. 441 (1895).

However, the sufficiency of a state indictment or information is not a matter for federal habeas corpus relief unless it can be shown that the indictment or information is so defective that the convicting court had no jurisdiction. *See Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989); *DeBenedictis v. Wainwright*, 674 F.2d 841, 842 (11th Cir. 1982) (citations omitted).

2.      Federal Review of State Court Decision

Ferrier presented Claims XIV and XV as Issue II of his Rule 3.800(a) motion (Ex. F1 at 6–9). With respect to the alleged factual defects in the charging document, Ferrier alleged the court lacked jurisdiction to try him for Counts I, II, and III, because the evidence produced at trial was "inconsistent" with the facts alleged in the charging document (*id.* at 8).

The state circuit court summarily denied the claims on the following grounds:

> Defendant alleges the Court is without jurisdiction to impose the above Judgment and Sentence because the State failed to allege a violation of Section 782.065, Fla. Stat. in the information. Although that section was not cited in the information, the information does allege that the victims are law enforcement officers (See Amended Information attached as Ex. 2). This is sufficient. See Figueroa v. State, 84 So. 3d 1158 (Fla. 2d DCA 2012).

> Defendant's third claim alleges that the sentence is illegal because the State did not allege their "factual theories" in the information. There is no legal requirement for the State to allege factual theories in the information.

(Ex. F1 at 50–51).

Ferrier appealed the decision to the First DCA (Ex. F2). The First DCA affirmed the circuit court's decision, thus determining that the record conclusively refuted Ferrier's claims (*see* Ex. F3). *See* Fla. R. App. P. 9.141(b)(2)(D) (on appeal from the summary denial of all claims raised in a Rule 3.800(a) motion without an

evidentiary hearing, the court must reverse the lower court's order unless the record

conclusively shows that the appellant is entitled to no relief).

Ferrier is not entitled to relief on his argument that the charging document was

unconstitutional with respect to Counts I, II, and III, because it did not charge all of

the factual theories which were presented in the officers' trial testimony.

The charging document alleged the following as to Counts I, II, and III:

COUNT I:  On May 31, 2010, Jerome J. Ferrier, did unlawfully attempt to kill a human being, Barry D. Blackburn, a sworn law enforcement officer while engaged in the lawful performance of duty, by shooting and striking him with a firearm, a deadly weapon, which the defendant actually possessed and discharged, and the attempted killing was perpetrated from or with a premeditated design or intent to effect the death of Barry D. Blackburn contrary to Sections 775.087 and 784.087, 777.04(4)(b) and 782.04(1)(a)l, Florida Statutes.

COUNT II:  On May 31, 2010, Jerome J. Ferrier, did unlawfully attempt to kill a human being, Kevin Shea, a sworn law enforcement officer while engaged in the lawful performance of duty, by shooting at him with a firearm, a deadly weapon, which the defendant actually possessed and discharged, and the attempted killing was perpetrated from or with a premeditated design or intent to effect the death of Kevin Shea, contrary to Sections 775.087 and 784.087, 777.04(4)(b) and 782.04(l)(a)l, Florida Statutes.

COUNT III:  On May 31, 2010, Jerome J. Ferrier, did unlawfully attempt to kill a human being, David Graham, a sworn law enforcement officer while engaged in the lawful performance of duty, by shooting at him with a firearm, a deadly weapon, which the defendant actually possessed and discharged, and the attempted killing was perpetrated from or with a premeditated design or intent to effect the death of David

Graham, contrary to Sections 775.087 and 784.087, 777.04(4)(b) and 782.04(l)(a)l, Florida Statutes.

(Ex. B1 at 12–14).

Rule 3.140 of the Florida Rules of Criminal Procedure provides:

**(b) Nature of Indictment or Information**.    The indictment or information on which the defendant is to be tried shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.
. . . .
**(d) The Charge**.

**(1) Allegation of Facts; Citation of Law Violated**.  Each count of an indictment or information on which the defendant is to be tried shall allege the essential facts constituting the offense charged. In addition, each count shall recite the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated. Error in or omission of the citation shall not be ground for dismissing the count or for a reversal of a conviction based thereon if the error or omission did not mislead the defendant to the defendant's prejudice.
. . . .
**(o) Defects and Variances**.  No indictment or information, or any count thereof, shall be dismissed . . . on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.

Fla. R. Crim. P. 3.140(o).

The state court did not unreasonably apply Supreme Court precedent in rejecting Ferrier's due process challenge to the charging document.  The facts alleged by the State were not so vague as to mislead Ferrier in the preparation of his defense.  The fact that the charging document did not describe every instance of Ferrier's shooting at each victim, as the officers did during their trial testimony, did not render the charging document so deficient as to deprive the trial court of jurisdiction.[13]

---

[13]  As an example of different "factual theories," Ferrier cited Deputy Shea's trial testimony on page 53, page 55 line 2, and page 59 lines 7–10 (*see* Ex. F1 at 9).  On page 53, Deputy Shea testified that when he pushed open the door to Ferrier's apartment, Ferrier immediately began to fire (*see* Ex. B3 at 53, lines 1–22).  On page 55 line 2, Shea testified that Ferrier then fired his gun outside a window of the apartment (*see id.* at 55, line 2).  On page 59 lines 7–10, Shea testified that when he was returning to scene upon retrieving his automatic rifle from his car, he saw Ferrier punching out a window and firing at him (*see id.* at 59 lines 7–10).

As another example, Ferrier cited Sergeant Graham's trial testimony on page 92 lines 1–6, page 108 line 14, and page 110 lines 3–16 (*see* Ex. F1 at 9).   On page 92, Sergeant Graham testified that as Deputy Shea pushed on the door of Ferrier's apartment, shots started coming through the door (Ex. B3 at 92).  On page 108, Graham testified that Deputy Shea returned two or three rounds of gunfire through a window of Ferrier's apartment (*id.* at 108, lines 13–14).  On page 110, Sergeant Graham testified that bark flew off a tree behind which he was taking cover, and Graham testified he saw Ferrier shoot at deputies from out of a window of the apartment (*id.* at 110, lines 3–16).

As a third example, Ferrier cited Lieutenant Blackburn's trial testimony on page 123 and pages 351–52 (*see* Ex. F1 at 9).  On page 123, Lieutenant Blackburn described Ferrier's shooting him in the shoulder (*see* Ex. B3 at 123).  When defense counsel called Lieutenant Blackburn as a witness, Blackburn provided additional details about Ferrier's shooting him in the shoulder, and he testified he was shot during a second burst of shots that came from inside Ferrier's apartment (*see* Ex. B4 at 352–56).

Additionally, the State's failure to cite § 782.065 in the charging document and failure to allege that Ferrier knew that the victims were law enforcement officers did not deprive the trial court of jurisdiction to sentence him.

Ferrier has not demonstrated he is entitled to federal habeas relief on either of the constitutional challenges to the charging document asserted in Claims XIV and XV.

### N.    Claim XVI: "Counsel failed to investigate exculpatory evidence in Violation of U.S. Const. Amends. V due process and VI right to counsel."

Ferrier alleges Attorney Holton failed to investigate the windows, curtains, blinds, and screens from four windows, specifically, the westside bedroom window (which related to the charge concerning officer Blackburn), westside living room window (which related to the charges concerning officers Shea and Graham), northside/northwest living room window (which related to the charge concerning officer Graham), and southside bathroom window (which related to the charge concerning officers Shea and Bethea) (ECF No. 53 at 46–48).  Ferrier alleges if Holton had tested these items, the results would have shown that the circumferences of the projectiles in the windows, blinds, curtains, and screens matched incoming .45 Glock projectiles, not outgoing 9mm projectiles from Ferrier's gun (*id.*).

Ferrier also contends Holton should have investigated and presented two .45 caliber projectiles, one recovered from a tree outside 2113 Owens Street, Apt. 2 (identified in the State's discovery documents as "JS-1") and the other recovered from the kitchen floor of 2113 Owens Street, Apt. 2 (identified in the State's discovery as "JS-2") (ECF No. 53 at 48).  Ferrier contends this evidence would have proved he did not shoot at Sergeant Graham when Graham ran from the front door of Ferrier's apartment (at 2115 Owens Street, Apt. #1) and between 2113 Owens Street and 2115 Owens Street (*id.*).

The State asserts this claim is similar to Ground VI of Ferrier's amended Rule 3.850 motion (Ferrier admitted in state court that he erroneously labeled this claim as Ground XI in his amended Rule 3.850 motion (*see* Ex. D3 at 455)) (ECF No. 74 at 42–44).  The State asserts Ferrier voluntarily abandoned two sub-claims (i.e., sub-claims I and II, which concerned Holton's failure to investigate the westside bedroom window and the westside living room window) by filing a motion to strike them from the amended Rule 3.850 motion, and the state circuit court's granting Ferrier's motion (*id.* at 44–45).  The State further asserts Ferrier abandoned all aspects of Claim XVI by failing to fully brief and argue his federal constitutional issue in his initial brief to the First DCA (*id.* at 43–44).  The State argues Ferrier did not argue error with respect to the circuit court's substantive adjudication of the

IATC claim and instead argued that the circuit court failed to adjudicate the claim at all, as evidenced by the circuit court's failure to make oral or written findings of fact and conclusion of law with respect to this particular IATC claim. The State contends Claim XVI is thus procedurally defaulted and procedurally barred from federal review (*id.*). The State alternatively argues that the state court's adjudication of Ferrier's failure-to-investigate claim was not contrary to or an unreasonable application of clearly established federal law (ECF No. 53 at 124–26).

Ferrier contends he exhausted all aspects of this IATC claim (ECF No. 78 at 46–47). He contends the circuit court adjudicated the merits, as evidenced by the court's reference to his failure-to-investigate claims in its written order (*id.*). Ferrier further contends he included argument on this issue in his appellate brief (*id.* at 47–48).

The State's exhaustion argument (that Ferrier abandoned part of Claim XVI in the circuit court and waived the remainder on appeal by failing to argue the merits) is somewhat tempting, but the Eleventh Circuit would likely reject it. *See Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 522 (11th Cir. 2019) (holding that state prisoner adequately exhausted claim that trial counsel was ineffective for failing to request a hearing on his stand-your-ground motion, where the prisoner fairly presented the same constitutional claim in state postconviction proceeding and on

appeal before Florida appellate court, even though the prisoner's appellate argument focused on the lower court's failure to hold an evidentiary hearing on claim) (citing *Henry v. Dep't of Corr.*, 197 F.3d 1361 (11th Cir. 1999) and *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018)).

The undersigned will thus determine whether Ferrier has demonstrated that the state court's adjudication of Claim XVI was contrary to or an unreasonable application of *Strickland*.

At the post-conviction evidentiary hearing, Ferrier's post-conviction counsel asked Attorney Holton about his pre-trial discussions with Ferrier about his version of the events underlying the charges (Ex. D4 at 553–54). Attorney Holton responded that Ferrier told him he feared law enforcement because he had been previously assaulted by an officer in New Orleans and hospitalized for his injuries (*id.* at 553). Ferrier's counsel asked Holton if he attempted to obtain Ferrier's hospital records, and Holton responded that he did but was unsuccessful (*id.* at 553–54). Ferrier's counsel did not inquire about Holton's investigation, or lack of investigation, of any other evidence. The court did not announce any findings on this issue at the conclusion of the evidentiary hearing (*id.* at 627–31).

In the court's written order denying Ferrier's amended Rule 3.850 motion, the court listed Ferrier's specific allegations of ineffective assistance of counsel (*see* Ex.

D3 at 519–20).   Included in the list was Ferrier's IATC claims relating to trial

counsel's failure to investigate evidence which would allegedly show that certain

shots were not fired from Ferrier's weapon (*see id.*).    The court addressed Attorney

Holton's pre-trial investigation as follows:

> The trial Court finds that Mr. Holton properly investigated the case and properly represented the Defendant at trial.  Review of the entire case file establishes that Mr. Holton, a defense attorney with vast experience and ability, thoroughly investigated the case and all witnesses.  He closely examined all items of evidence and involved the Defendant in every phase of the case.  He stated that he met with the Defendant much more often than he did with other clients.  Further he had to deal with the fact that the Defendant is a prolific writer, as is evidenced by the plethora of handwritten submissions in the Court file.  His testimony at hearing regarding the state of his investigation was clearly credible, and the testimony of the Defendant was not credible and at most, self serving [sic].
> . . . .
> The Defendant complains that Mr. Holton failed to investigate and obtain records necessary in his case.  Mr. Holton discussed his exhaustive investigation of the case, including attempts to obtain records from New Orleans that were destroyed by Katrina.  The Defendant stated that he did not receive discovery or trial transcripts.  The record does not support this complaint.  The Defendant's own submissions belie this statement, as he is well versed in the facts of his case, which would be impossible had he not been provided discovery.
>
> In considering all the evidence and the performance of Mr. Holton, the Court finds that the Defendant was properly convicted by the evidence, and he is at best Monday morning quarterbacking.  The attorney for the Defendant presented a proper defense, properly investigated the case, and made judgment calls at trial that gave the Defendant a very good chance of winning the case.  The fact that the Defendant was convicted is not based upon poor performance by his

attorneys, but instead, upon more than adequate evidence for a jury to
convict.  The fact that an argument was not accepted by the jury does
not mean it was not proper.

. . . .

Having reviewed at length all of the evidence herein and the law,
this Court finds that the Motion of the Defendant is not well taken, and
does not meet the criteria established in Strickland v. Washington, 466
U.S. 668 (1983), and the cases following it on the issue of effective
representation of a client.  *Not only did he fail to establish and
ineffective or insufficient representation by Mr. Holton, he failed the
second prong of Strickland by not establishing that the outcome would
have been an [sic] different had Mr. Holton done everything he
complains about.*

(Ex. D3 at 520–22, 524–25) (emphasis in original).

With respect to Attorney Holton's failure to investigate the windows, curtains,

blinds, and screens from the windows, Ferrier offered the state court no evidence

that investigation of any of these items would have produced evidence beneficial to

the defense.  All that Ferrier offered the state court was a conclusory assertion, in his

amended Rule 3.850 motion itself, that such investigation would have helped the

defense.    Ineffective  assistance  of  counsel  cannot  be  proven  via  conclusory

assertions.  *See, e.g., Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333–34

(11th Cir. 2012).  Furthermore, the officers who testified at trial stated that they saw

Ferrier shoot out of the windows, and that Ferrier did so by **sticking his hand**

**outside the windows**.  Ferrier has not shown that examination of the window,

curtains, blinds, or screens would have produced evidence of any probative value

with respect to whether Ferrier shot at officers from the windows.  The state court did not unreasonably apply *Strickland* in rejecting this claim.

Ferrier's remaining allegation is that Attorney Holton failed to investigate and present evidence that two .45 caliber projectiles, identified as "JS-1" and "JS-2" in the State's discovery, proved that he did not shoot at Sergeant Graham.  In the state circuit court, Ferrier attached reports from the Leon County Sheriff's Office and the Florida Department of Law Enforcement to his original Rule 3.850 motion (*see* Ex. D3 at 315–16, 321–30).  The LCSO report stated that a projectile designated as "JS-1" was found embedded in a tree in front of 2113 Owens Street, Apt. #2, the apartment which neighbored Ferrier's apartment at 2115 Owens Street, Apt. #1 (*see id.* at 330).  The projectile was embedded in a bullet hole labeled as "I-1" or "Impact 1" in the LCSO report (*id.* at 329–30).  The bullet hole was 5 feet, 9 ½ inches from the ground (*id.*).  Another projectile designated as "JS-2" was found on the kitchen floor of 2113 Owens Street, Apt. #2 (*id.* at 330).  It was believed to be the projectile which caused the impacts labeled as "I-4" (the south wall of 2113 Owens Street, Apt. #2 at the top of the window next to the door) and "I-63" (the cabinet above the stove in the kitchen of 2113 Owens Street, Apt. #2) (*id.* at 329–30).  The projectile was next to the refrigerator and measured 12 inches from the interior side of the doorframe of the door leading from the kitchen outside to the south side of the

apartment (*id.* at 330).  The projectile measured 2 feet, 1 inch from the bottom of the stove (*id.*).

The FDLE report stated that JS-1 and JS-2 were "two fired 45 caliber jacketed hollow point projectiles" (Ex. D3 at 315).  The FDLE report stated the results of the examinations of JS-1 and JS-2 were that (1) they were not fired from a 9mm pistol (the pistol Ferrier used), (2) they could not be identified nor eliminated as having been fired from the same firearm, and (3) firearms with the rifling specifications of JS-1 and JS-2 "include Glock, among others" (Ex. D3 at 316).

Ferrier has not shown that Attorney Holton's further investigation into the two .45 caliber projectiles would have produced any different or additional evidence than the FDLE's examination.  Further, there is no reasonable probability the jury would have found him not guilty of attempted first degree murder of Sergeant Graham if Attorney Holton had presented evidence of the two projectiles (JS-1 and JS-2).  The jury was aware, from the testimony of the officers and Detective Pat McCleod, who processed the crime scene, that the officers exchanged fire with Ferrier, and that there was evidence of projectiles from the officers' .45 caliber Glocks recovered both inside and outside Ferrier's apartment (*see* Ex. B5 at 250, 279–80).  And Attorney Holton elicited testimony from the officers that they were sometimes "in crossfire" during the 30–45-minute shootout, meaning, their physical

positions sometimes put them at risk of being shot by one another (Ex. B3 at 55–56).  But the jury also heard testimony that 9mm projectiles were recovered near a vehicle parked outside the front door of Ferrier's apartment (designated "PM-36" and "PM-74") (Ex. B5 at 261–62).  And the jury heard testimony that one of Sergeant Graham's positions was just outside Ferrier's front door, and that Ferrier shot at Sergeant Graham and Deputy Shea through the front door before any officers fired their weapons (*see* Ex. B3 at 48–55).

Considering the record, the state court did not unreasonably apply *Strickland* in rejecting Ferrier's claims concerning Attorney Holton's failure to investigate. Ferrier is not entitled to federal habeas relief on Claim XVI.

### O.   Claim XVII:  "Counsel failed to impeach based upon changes in testimonies in violations [sic] of U.S. Const. Amends. V due process and VI right to counsel."

Ferrier contends Attorney Holton was ineffective for failing to impeach Lieutenant Blackburn, Deputy Cutcliffe, and Deputy Wilson with inconsistent statements they made to LCSO detectives during pre-trial interviews (ECF No. 53 at 49–51).  For example, Ferrier alleges Blackburn testified Ferrier shot at him while he was on Palmetto and Owens Streets; but Blackburn told a detective while he was in that location "additional shots went off" and he did not know where they came from (*id.* at 49).  Ferrier alleges Deputy Cutcliffe testified Ferrier shot at him while

he was on the corner with Lieutenant Blackburn; but Cutcliffe told a detective that while he was in that location "there was more shooting" but he "could not remember a lot about that part" (*id.*).  Ferrier alleges Deputy Wilson testified he believed that shots were fired in his direction while he was squatting near the engine block of a vehicle; but Wilson did not tell the interviewing detective that Ferrier shot at him, nor did Wilson report that he saw Ferrier shooting at Deputy Shea (*id.* at 49–50).

Ferrier asserts the alleged inconsistencies was evidence of fraud, perjury, conspiracy, and collusion by the prosecutor and officers, and violated *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972) (ECF No. 53 at 50).  Ferrier asserts the result of his trial would have been different if Attorney Holton had impeached these officers with their prior inconsistent statements (*id.* at 50–51).

The State asserts Ferrier presented this IATC claim as Issue III of his Rule 3.800(a) motion, but the state court rejected it as untimely and successive (ECF No. 74 at 46–47).   The State contends Ferrier is thus not entitled to federal review (*id.*). The State alternatively argues Ferrier would not be entitled to relief notwithstanding the procedural bar, because his conclusory allegations of prejudice are too speculative to establish prejudice under *Strickland* (*id.* at 128).

The state court record demonstrates Ferrier presented this IATC claim as Issue III of his Rule 3.800(a) motion (Ex. F1 at 10–14, 16).  The state circuit court denied Ferrier's IATC claims as untimely and successive (*id.* at 21).  The First DCA affirmed the decision without elaboration (Ex. F3).

For the reasons discussed *supra* in Claim XII, the state court's rejection of Ferrier's IATC claim was based upon an independent and adequate state ground of procedural bar or default; therefore, this federal court also considers the claim procedurally defaulted.

Ferrier relies upon *Martinez* to excuse the procedural default (*see* ECF No. 78 at 50–51).  But Ferrier has failed to demonstrate that his IATC claim is substantial, or that his post-conviction counsel was ineffective for failing to present it in Ferrier's first Rule 3.850 proceeding.  Considering the overwhelming amount of inculpatory evidence introduced at Ferrier's trial, there is no reasonable probability the post-conviction court would have granted relief if Ferrier's counsel had presented this IATC claim (in other words, there is no reasonable probability the post-conviction court would have found that there was a reasonable probability any of the verdicts would have been different if Attorney Holton had questioned the officers about the alleged inconsistencies identified by Ferrier).  Ferrier is not entitled to federal review of the IATC claim asserted in Claim XVII.

**P.    Claim XVIII:    "Counsel failed to investigate witness [Elizabeth Hollifield] in violation of U.S. Const. Amend VI right to obtain witnesses."**

Ferrier contends Attorney Holton was ineffective for failing to investigate his landlord, Elizabeth Hollifield, as a witness (ECF No. 53 at 52–53).  Ferrier asserts Ms. Hollifield was at the scene and provided officers with the key to Ferrier's apartment (*id.*).  Ferrier asserts his telephone records showed that he called Ms. Hollifield at 11:00 a.m. the day of the shooting, approximately the same time officers attempted to enter his residence (*id.*).  Ferrier contends this evidence would have refuted the officers' testimony that their entry into his apartment was justified by exigent circumstances, because it would have shown that the officers knew he was not dead or injured (*id.*).  Ferrier contends if Attorney Holton had presented Ms. Hollifield's testimony and the phone records, the trial court would have granted Holton's "Stand Your Ground" motion, or the jury would have found that Ferrier's use of force was justified (*id.*).

The State argues that Claim XVIII is similar to Grounds I and IV of Ferrier's amended Rule 3.850 motion; however, Ferrier voluntarily abandoned the claims when the circuit court granted his motion to strike them (*see* ECF No. 74 at 47–49).  The State further contends Ferrier abandoned the claims in the post-conviction appeal to the First DCA (*id.*).  The State contends Claim XVIII is thus unexhausted,

and because state procedural rules preclude Ferrier from returning to state court to attempt to exhaust the claim, it is procedurally barred from federal review (*id.*).  The State alternatively argues that Ferrer's conclusory allegations were too speculative to establish prejudice under *Strickland*; therefore, the state court's adjudication of Ferrier's "similar claims" is entitled to deference under section 2254(d) (*id.* at 127–28).

The state court record demonstrates that Ferrier presented this IATC claim as Grounds I and IV of his amended Rule 3.850 motion (Ex. D3 at 394–95, 402–03). In Ground I, Ferrier argued that Attorney Holton was ineffective for failing to investigate Ms. Hollifield to determine what she did and saw while in the officers' presence (*id.* at 394–95).  In Ground IV, Ferrier argued that Attorney Holton should have used Ferrier's phone records to impeach the officers' testimony that they did not receive any response from Ferrier before they attempted to enter his apartment (*id.* at 402).  Ferrier included these claims in his Motion to Strike, which the circuit court granted (*id.* at 454–55, 482–84).  Ferrier's post-conviction counsel did not reference this IATC claim in his pre-hearing memorandum, nor did he question Attorney Holton about investigating  Elizabeth Hollifield or Ferrier's phone call to Hollifield (*see* Ex. D4).

The court did not announce any findings on this issue at the conclusion of the evidentiary hearing (Ex. D4 at 627–31).  But in the court's written order denying Ferrier's amended Rule 3.850 motion, the court identified Ferrier's specific allegations regarding counsel's failure to investigate Elizabeth Hollifield and Ferrier's phone records (Ex. D3 at 519).  As previously discussed, the court addressed Ferrier's failure-to-investigate claims as follows:

> The trial Court finds that Mr. Holton properly investigated the case and properly represented the Defendant at trial.  Review of the entire case file establishes that Mr. Holton, a defense attorney with vast experience and ability, thoroughly investigated the case and all witnesses.  He closely examined all items of evidence and involved the Defendant in every phase of the case.  He stated that he met with the Defendant much more often than he did with other clients.  Further he had to deal with the fact that the Defendant is a prolific writer, as is evidenced by the plethora of handwritten submissions in the Court file.  His testimony at hearing regarding the state of his investigation was clearly credible, and the testimony of the Defendant was not credible and at most, self serving [sic].
> . . . .
> The Defendant complains that Mr. Holton failed to investigate and obtain records necessary in his case.  Mr. Holton discussed his exhaustive investigation of the case, including attempts to obtain records from New Orleans that were destroyed by Katrina.  The Defendant stated that he did not receive discovery or trial transcripts.  The record does not support this complaint.  The Defendant's own submissions belie this statement, as he is well versed in the facts of his case, which would be impossible had he not been provided discovery.
>
> In considering all the evidence and the performance of Mr. Holton, the Court finds that the Defendant was properly convicted by the evidence, and he is at best Monday morning quarterbacking.  The

attorney for the Defendant presented a proper defense, properly investigated the case, and made judgment calls at trial that gave the Defendant a very good chance of winning the case. The fact that the Defendant was convicted is not based upon poor performance by his attorneys, but instead, upon more than adequate evidence for a jury to convict. The fact that an argument was not accepted by the jury does not mean it was not proper.

. . . .

Having reviewed at length all of the evidence herein and the law, this Court finds that the Motion of the Defendant is not well taken, and does not meet the criteria established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1983), and the cases following it on the issue of effective representation of a client. *Not only did he fail to establish and ineffective or insufficient representation by Mr. Holton, he failed the second prong of <u>Strickland</u> by not establishing that the outcome would have been an [sic] different had Mr. Holton done everything he complains about.*

(Ex. D3 at 520–22, 524–25) (emphasis in original).

Ferrier appeal the decision to the First DCA. Where, as here, a defendant appeals from an order denying post-conviction relief after an evidentiary hearing, he is required to file an initial brief. Fla. R. App. Proc. 9.141(b)(3)(C). Issues not raised and argued in the initial brief are abandoned. *See Atwater v. Crosby*, 451 F.3d 799, 809–10 (11th Cir. 2006) (citing *Shere v. State*, 742 So. 2d 215, 217 n.6 (Fla. 1999) (recognizing Florida's rule that an issue raised in an appellate brief which contains no argument is abandoned)); *see also Duest v. Dugger*, 555 So. 2d 849, 851 (Fla. 1990) (holding that issues raised on appeal from an order denying post-conviction

relief were procedurally barred when petitioner received an evidentiary hearing and failed to fully brief and argue the points on appeal).

The state court record establishes that in Ferrier's initial brief in the post-conviction appeal, he did not mention Ground I, Ground IV, Elizabeth Hollifield, the phone records, or trial counsel's failure to investigate Ms. Hollifield or the phone records (*see* Ex. D6). Ferrier's failure to invoke one complete round of Florida's established appellate review process—by abandoning Grounds I and IV on appeal—renders Ground XVIII of Ferrier's § 2254 petition unexhausted. Because any further attempt by Ferrier to exhaust those issues in state court would be futile, they are procedurally defaulted.

Ferrier relies upon *Martinez* to overcome the procedural default (*see* ECF No. 78 at 54–55). However, *Martinez* applies only where the petitioner alleges ineffective assistance of counsel in an **initial-review** collateral proceeding, and not in an **appeal** from such a proceeding. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1260 (11th Cir. 2014). Ferrier is not entitled to federal review of Claim XVIII.

> **Q.    Claim XIX: "Counsel failed to cross-exam [sic] Pat McCleod concerning shooting reconstruction in violation of U.S. Const. Amends. V due process and VI right to present defense counsel [sic]."**

Ferrier contends Attorney Holton was ineffective for cross-examining Jeffrey Foggy, instead of Pat McCleod, about "shooting reconstruction" (ECF No. 53 at 54). Ferrier asserts if Holton had cross-examined Mr. McCleod, the jury would have heard that Ferrier's 9mm pistol was not aimed at any officer, and there were no 9mm projectiles located near any of the officers' positions (*id.*).

The State asserts Ferrier presented this IATC claim as Issue IV of his Rule 3.800(a) motion, but the state court rejected it as untimely and successive (ECF No. 74 at 49–51, 129). The State contends Ferrier is thus not entitled to federal review (*id.*). The State alternatively argues Ferrier would not be entitled to relief notwithstanding the procedural bar, because his conclusory allegations of prejudice are too speculative to establish prejudice under *Strickland* (*id.* at 129).

The state court record demonstrates Ferrier presented this IATC claim as Issue IV of his Rule 3.800(a) motion (Ex. F1 at 15). The state circuit court denied Ferrier's IATC claims as untimely and successive (*id.* at 21). The First DCA affirmed the decision without elaboration (Ex. F3).

For the reasons discussed *supra* in Claims XII and XVII, the state court's rejection of Ferrier's IATC claim was based upon an independent and adequate state ground of procedural bar or default; therefore, this federal court also considers the claim procedurally defaulted.

Ferrier does not allege cause for the procedural default of Claim XIX (*see* ECF No. 78).  And even if he attempted to rely upon *Martinez*, he would not be entitled to federal review of the claim, because his post-conviction counsel was not ineffective for failing to present this IATC claim in the Rule 3.850 proceeding.  The trial transcript demonstrates that Attorney Holton **did** question Detective McCleod about the trajectory of some of the projectiles (*see* Ex. B5 at 286, 290–292).  And considering the overwhelming amount of inculpatory evidence, there is no reasonable probability the post-conviction court would have granted relief on this IATC claim if Ferrier's post-conviction counsel had presented it.  Ferrier is not entitled to federal habeas relief on Claim XIX.

> **R.    Claim XX:  "Appellate counsel failed to raise on direct appeal that the trial court abused its discretion by not allowing Petitioner to represent himself with the aid of trial counsel acting as co-counsel in violation of U.S. Const. Amend. V, XIV due process, *Faretta v. California*, 422 U.S. 806 (1975)."**

Ferrier contends his appellate counsel was ineffective for failing to argue that the trial court erred by failing to appoint standby counsel at a hearing on July 26, 2011 (ECF No. 53 at 55–56).  Ferrier asserts the First DCA would have granted a new trial if appellate counsel had presented this issue on direct appeal (*id.*).

The State asserts Ferrier asserted a similar claim in his "Supplemental Fla. R. 9.141(d) Petition" filed in the First DCA on September 5, 2017 (ECF No. 74 at 51–

52). The state asserts the First DCA ordered the supplemental petition to be "stricken as unauthorized" based upon a firmly established and regularly followed state procedural rule (*id.*). The State contends Claims XX is thus procedurally barred from federal review (*id.* at 51–52, 129–30). The State alternatively argues Ferrier would not be entitled to relief notwithstanding the procedural bar, because he failed to establish a substantial likelihood that the outcome of his direct appeal would have been different if his appellate counsel had argued that the trial court erred by failing to allow Ferrier to represent himself with trial counsel acting as co-counsel (*id.* at 130–31).

The state court record demonstrates that Ferrier filed a "Successive Writ of Habeas Corpus Pursuant to Florida Appellant [sic] Rule 9.141(d)" on June 21, 2017 (Ex. G1). On August 1, 2017, the First DCA dismissed the petition pursuant to Rule 9.141(d)(5) of the Florida Rules of Appellate Procedure (Ex. G3). On September 5, 2017, Ferrier filed a "Supplemental Fla. R. 9.141(d) Petition," asserting the claim he presents in Claim XX of his § 2254 petition (Ex. G6). On September 27, 2017, the First DCA order the supplemental petition "stricken as unauthorized" (Ex. G7). Ferrier attempted to invoke the discretionary jurisdiction of the Florida Supreme Court (Ex. G8), but the court dismissed the case for lack of jurisdiction (Ex. G9).

The procedural rule upon which the First DCA relied provides that petitions alleging ineffective assistance of appellate counsel must be filed no later than two years (four if there are allegations that petitioner was "intentionally misled") after any appellate mandate enters in the initial proceedings.  Fla. R. App. P. 9.141(d)(5).  Here, the appellate mandate was entered in Ferrier's direct appeal on May 22, 2013.  As a result, Ferrier had until May 22, 2017, **at the latest**, to file his IAAC claim in the First DCA.  Ferrier filed the instant IAAC claim in the First DCA on September 5, 2017, **after** the maximum limitation period expired.  And even the state habeas petition he sought to "supplement" with the instant IAAC claim was filed beyond the four-year deadline (on June 21, 2017).

The First DCA's rejection of Ferrier's IAAC claim was based upon a firmly established and regularly followed state procedural rule.  Therefore, the claim is procedurally barred from federal review.  Ferrier has not demonstrated he is entitled to federal review of the IAAC claim through any recognized exception to the procedural bar.  Accordingly, Ferrier is not entitled to habeas relief on Claim XX.

V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El*, 537 U.S. at 336 (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the claims asserted in the third amended petition for writ of habeas

corpus and supporting memorandum (ECF Nos. 52, 53) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 12<u>th</u> day of February 2020.


                                        /s/ *Elizabeth M. Timothy*
                                        **ELIZABETH M.  TIMOTHY**
                                        **CHIEF UNITED STATES MAGISTRATE JUDGE**


                            **<u>NOTICE TO THE PARTIES</u>**

        **Objections to these proposed findings and recommendations must be
filed within fourteen (14) days after being served a copy thereof.  <u>Any different
deadline that may appear on the electronic docket is for the court's internal use
only and does not control</u>.  A copy of objections shall be served upon all other
parties.   If a party fails to object to the magistrate judge's findings or
recommendations as to any particular claim or issue contained in a report and
recommendation, that party waives the right to challenge on appeal the district
court's order based on the unobjected-to factual and legal conclusions. *See* 11th
Cir. Rule 3-1; 28 U.S.C. § 636.**